## ARTUKOVIC v. BOYLE.

### Civ. No. 13467.

United States District Court,
S. D. California, C. D.
July 14, 1952.

O'Connor & O'Connor, Los Angeles, Cal., Robert .T. Reynolds (of Snyder & Reynolds), Washington, D. C., Vincent G. Arnerich of Arnerich, Del Valle & Sinatra, Los Angeles, Cal., for petitioner.

Walter S. Binns, U. S. Atty., Clyde C. Downing, Chief, Civil Division, Asst. U. S. Atty., Arline Martin, Asst. U. S. Atty., all of Los Angeles, Cal., for respondent.

Ronald Walker, Los Angeles, Cal., for Federal People's Republic of Yugoslavia.

HALL, District Judge.

On August 29, 1951, the petitioner, Andrija Artukovic, was arrested in Los Angeles pursuant to a warrant of arrest issued by the United States Commissioner of this district and division, Howard V. Calverley, upon a complaint filed that day for extradition to the country now known as Yugoslavia.

The complaint was signed by one Rafo Ivancevic who described himself as "Consul General of the Federal People's Republic of Yugoslavia." The complaint did not directly charge the petitioner herein with any offense but alleged that the complainant Ivancevic was "informed through Yugoslavian Consular channels" that the petitioner herein was duly charged in Yugoslavia with "having murdered and caused to be murdered" several persons named in the complaint, during the years 1941 and 1942, and that a warrant had been issued in Yugoslavia for his arrest.

Extradition was and is sought under the provisions of Title 18 U.S.C. §§ 3181, 3184, 3188, 3189, 3190, 3195,[1] and the

"Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any commissioner authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with

Treaty of Extradition with the Kingdom of Serbia of May 17, 1902, 32 Stat. 1890.[2]

having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

"§ 3188. Time of commitment pending extradition

"Whenever any person who is committed for rendition to a foreign government to remain until delivered up in pursuance of a requisition, is not so delivered up and conveyed out of the United States within two calendar months after such commitment, over and above the time actually required to convey the prisoner from the jail to which he was committed, by the readiest way, out of the United States, any judge of the United States, or of any State, upon application made to him by or on behalf of the person so committed, and upon proof made to him that reasonable notice of the intention to make such application has been given to the Secretary of State, may order the person so committed to be discharged out of custody, unless sufficient cause is shown to such judge why such discharge ought not to be ordered."

"§ 3189. Place and character of hearing

"Hearings in cases of extradition under treaty stipulation or convention shall be held on land, publicly, and in a room or office easily accessible to the public."

"§ 3190. Evidence on hearing

"Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required."

"§ 3195. Payment of fees and costs

"All costs or expenses incurred in any extradition proceeding in apprehending, securing, and transmitting a fugitive shall be paid by the demanding authority.

"All witness fees and costs of every nature in cases of international extradition, including the fees of the commissioner, shall be certified by the judge or commissioner before whom the hearing shall take place to the Secretary of State of the United States, and the same shall be paid out of appropriations to defray the expenses of the judiciary or the Department of Justice as the case may be.

"The Attorney General shall certify to the Secretary of State the amounts to be paid to the United States on account of said fees and costs in extradition cases by the foreign government requesting the extradition, and the Secretary of State shall cause said amounts to be collected and transmitted to the Attorney General for deposit in the Treasury of the United States."

2.
"October 12, 1901.
October 25, 1901.

"Treaty between the United States and Servia for the mutual extradition of fugitives from justice. Signed at Belgrade, October 25, 1901; ratification advised by the Senate, January 27, 1902; ratified by the President, March 7, 1902; ratified by Servia, March 17, 1902; ratifications exchanged at Belgrade, May 13, 1902; proclaimed May 17, 1902.

"By the President of the United States of America.

"A Proclamation.

"Preamble.

"Whereas a Treaty between the United States of America and Servia providing for the extradition of fugitives from justice was concluded and signed by their respective Plenipotentiaries at Belgrade on the twenty-fifth (twelfth) day of October, one thousand nine hundred and one, the original of which Treaty, being in the English and Servian languages, is word for word as follows:

"Contracting parties.

"The United States of America and His Majesty the King of Servia, being desirous to confirm their friendly relations and to promote the cause of Justice,

Section 3141 of Title 18 U.S.C.[3] does not permit bail to be taken by a Commissioner·in a capital case and accordingly it was refused by the Commissioner, where upon the petitioner filed the petition for a writ of habeas corpus on September 12, 1951, wherein his release was then sought on bail pending the hearing on the com

have resolved to conclude a treaty for the extradition of fugitives from jus tice between the United States of America and the Kingdom of Servia, and have appointed for that purpose the follow ing Plenipotentiaries:

"Plenipotentiaries.

"The President of the United States of America, Charles S. Francis, Envoy Extraordinary and Minister Plenipotentiary to His Majesty the King of Servia.

"His Majesty the King of Servia, M. Michel V. Vouitch, President of His Council of Ministers, Minister for Foreign Affairs, Senator, Grand Officer of the Order of Milosh the Great, Grand Cross of the Order of Takovo, Officer of the Order of the White Eagle, etc. etc., who, after having communicated to each other their respective full powers, found in good and due form, have agreed upon and concluded the following articles:

"Article I.

"Reciprocal delivery of persons charged with crimes.

"The Government of the United States and the Government of Servia mutually ·agree to deliver up persons who, having been charged with or convicted of any of the crimes and offenses specified in the following article, committed within the jurisdiction of one of the high contracting parties, shall seek an asylum or be found within the territories of the other: Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been committed there.

"Article II.

"Extraditable crimes.

Murder, etc.

"Extradition shall be granted for the following crimes and offenses:

"1. Murder, comprehending assassination, parricide, infanticide, and poisoning; attempt to commit murder; manslaughter, when voluntary.

* * * * *

"Extradition is also to take place for participation in any of the crimes and offenses mentioned in this Treaty, provided such participation may be punished in the United States as felony and in Servia as crime or offense as before specified.

"Article III.

"Requisitions for the surrender of fugitives from justice shall be made by the Governments of the high contracting parties through their diplomatic agents, or in the absence of such through their respective superior consular officers.

"If the person whose extradition is requested shall have been convicted of a crime or offense, a duly authenticated copy of the sentence of the Court in which he has been convicted, or if the fugitive is merely charged with crime, a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued, shall be produced.

"Proceedings.

"The extradition of fugitives under the provisions of this Treaty shall be carried out in the United States and in Servia, respectively, in conformity with the laws regulating extradition for the time being in force in the State on which the demand for surrender is made.

* * * * *

"Article VI.

"No surrender for political offenses.

"A fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character.

"Political offenses prior to extradition.

"No person surrendered by either of the high contracting parties to the other shall be triable or tried, or be punished, for any political crime or offense, or for any act connected therewith, committed previously to his extradition.

"Decision.

"If any questions shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the Government on which the demand for surrender is made, or which may have granted the extradition, shall be final."

3. Title 18 U.S.C.A. § 3141.

"§ 3141. Power of courts and magistrates

"Bail may be taken by any court, judge or magistrate authorized to arrest and commit offenders, but in capital cases bail may be taken only by a court of the

plaint for extradition before the Commissioner.

At the time of the return to the writ on September 17, 1951, the United States Marshal, Honorable James J. Boyle, appeared by the United States Attorney, and the Yugoslavian Government appeared by its counsel, Ronald L. Walker, Esq., both in opposition to the granting of the writ.

On that hearing it became apparent from arguments of counsel that the petitioner desired to and was in fact, attacking the legal merits of the extradition complaint on grounds not stated in the then pending petition. Accordingly, the petitioner, upon motion, was allowed to amend by adding to the petition challenges to the legal merits of the proceedings on the grounds of noncompliance with applicable statutes, nonexistence of an extradition treaty with Yugoslavia, and that the complaint showed on its face that the alleged crimes were "political offenses," that is, that the complaint on its face did not allege facts which, if true, would entitle the Yugoslavian government to extradite the petitioner either under the statutes or under the treaty depended upon by the Yugoslavian government. The amended petition was filed September 19, 1951.

The petition as thus amended, together with the response filed by the Marshal and by the Yugoslavian Government raised serious questions which would not permit of a precipitous or hurried decision. The parties desired to brief and to argue the legal points raised. Accordingly the matter was continued to October 8, 1951.

■ In the exercise of the undoubted power and jurisdiction of the court on the filing of the petition for a writ of habeas corpus to enlarge a petitioner on bail pending the determination of the merits of the writ, Barth v. Clise, 1871, 12 Wall. 400, 402, 79 U.S. 400, 401, 402, 20 L.Ed. 393; Wright v. Henkel, 1903, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948; In re Mitchell, D.C.1909, 171 F. 289; Fernandez v. Phillips, 1925, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970; In re Gannon, D.C.1928, 27 F.2d 362; In re Klein, D.C.1930, 46 F.2d 85, the petitioner was enlarged on bail pending the final hearing and decision on the petition for writ of habeas corpus. Although petitioner had been enlarged on bail in the sum of $1,000 in the deportation proceeding against him, his bail herein was fixed at $50,000, with his consent, and corporate bail was not allowed.[4]

United States having original or appellate jurisdiction in criminal cases or by a justice or judge thereof. June 25, 1948, c. 645, 62 Stat. 821."

4. "The Court:
"1 The only thing I am giving consideration to now, is the matter of granting bail pending the final hearing and determination on the petition for the writ of habeas corpus. * * *" Transcript, page 217, lines 7-10.
"I think, as all counsel have agreed, the rule is probably stated in Wright v. Henkel to be that ordinarily bail should not be granted in cases of foreign extradition and that they may do so, if at all, only in cases where there are special circumstances.
"The decision to be made here is the matter of the judgment of this court and my discretion as to finally whether or not he will appear as ordered by this court. So far as the special circumstances are concerned, I think that they exist here. I am impressed by the date of the alleged offenses, 1941; and the fact that Yugoslavia was invaded by Ger-

many on April 6, 1941, and thereafter occupied by Germany until 1945 and that the whole world and especially that portion of the world, was in a terrible turmoil.
"I certainly do not want to have this taken as an indication of any ultimate judgment, but I cannot help but think that it might be possible, if extradition treaties with various countries were carried out to the letter in connection with charges that might be made, they might demand the extradition of every person who was a member of any armed forces against them and charge them with having committed murder, because surely people who are members of armed forces do kill other people, and they kill them just as dead as they would if they privately did it and certainly with as much intention.
"Another reason that I think there is a special circumstance here, which is existent at this time, is the lack of a direct charge in the complaint which is filed with the Commissioner. It is not a direct charge that he did commit murder,

On October 8, 1951, counsel for Yugoslavia indicated that he desired to file an amended complaint before the Commissioner. Accordingly, after further testimony and argument on that day, the matter was again continued to October 22, 1951. In

but says that he is informed that there is a charge made of having murdered or caused to be murdered. I searched the treaty in vain for any offense defined as 'causing murders'.

"However, I do not wish to be understood as finally passing on that, but I indicate it merely as something that has some very slight weight.

"Another special circumstance is the fact that while he came to this country under an assumed name, shortly after his arrival and as early as January 1949 he disclosed his true identity to the State Department, also the introduction of the bill in Congress, I think in May of that year, or March 11, 1949, wherein his true identity is disclosed, as well as disclosure made that he came into this country under the name of Anich instead of under this true name. It was well known to the State Department and presumably well known to the Yugoslavian officials.

"Since that time and since he came to California he has lived openly and notoriously under his true name. His wife and his children likewise have lived openly and notoriously under their true names. His children have been attending school under their true names. So there has been no concealment of his identity here and no continued concealment, and there was a revelation of his true identity long before any demand was made, according to the evidence presently before me, for his extradition to Yugoslavia.

"Another special circumstance is the fact that on March 31 of this year a demand was made on the State Department for his return to Yugoslavia as a war criminal, and it was after that that deportation proceedings were instituted, so that the Government of the United States knew—and I apprehend that it is a fair inference, knowing as much as I know about the operations of the Government—that probably the institution of the deportation proceedings was agitated or commenced at the suggestion of the Yugoslavian government, who then certainly knew that he was in the United States and who he was and where he was.

"Another special circumstance of very great significance is the fact that the knowledge of the Government of the United States, and with the knowledge and the presumptive and inferred knowledge of the Yugoslavian government, the demanding government, that he was here,

that a bond in the sum of $1000 was fixed to permit his release on bail in the deportation proceedings.

"I have seen the defendant on the witness stand. I have had an opportunity to observe him. I called the pastor of his church, not for the purpose of ascertaining whether or not the defendant attended church, but because it seemed to me that if he did attend church and if he did discuss these matters of his life and his conscience with his pastor, that the pastor would be able to have some independent appraisal of his character. From seeing the petitioner on the witness stand, I am impressed with his sincerity and with his honesty and I am of the firm conviction that I do not believe that the petitioner will fail to respond to an order of this court to return here at any designated date.

"Moreover, one additional circumstance, a matter that a person must take into consideration when exercising judgment such as is my responsibility at this time, is the fact that the defendant has a wife and four children here. And another one is probably that here, in this country and in this proceeding, is his only chance for vindication of what he has conceived to be his efforts to advance his own ideas for the welfare of his native land.

"I am therefore going to make an order enlarging him on bail. I will now fix the time. How long will you want for briefs?

"What I had in mind was that I would require each side to file opening briefs simultaneously and then give each side five days to reply to the other. Can you conclude them in ten days or fifteen days?

"Mr. O'Connor: Fifteen days, your Honor.

"Mr. Walker: I am trying to add time ahead here so as not to get ahead of his October 22nd date.

"The Court: That will be a total of 20 days.

"Mr. Walker: As long as it is before October 22nd, it would be entirely satisfactory. Yes, that would make our brief due about the 3rd or 4th of October.

"The Court: Each party may have until October 4th at 5:00 o'clock to file simultaneous opening briefs, and each party may thereafter have until October 9th—I think instead of October 4th I will make that date October 1st, Monday, to file simultaneous opening briefs. You will then have until October 4th—that is three days—to file reply briefs, and the

the meanwhile and on October 15, 1951, the Yugoslavian government filed with the Commissioner an amended complaint, a part of which consisted of authenticated copies of an English translation of a "warrant" issued by the "County Court of Zagreb" of the "People's Republic of Croatia" on September 6, 1951, and an "indictment" which was filed with that court on the same day. This complaint on its face showed that no charge had been filed in any court in Yugoslavia on the date of the filing of the original complaint (August 29, 1951) and was not filed until some days thereafter, (September 4, or 5, or 6, 1951.) That deficiency and others as existed in the original complaint and as are not present in the amended one were remedied by the amended complaint. Mishimura Ekiu v. United States, 1892, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146; Iasigi v. Van De Carr, 1897, 166 U.S. 391, 17 S.Ct. 595, 41 L.Ed. 1045.

The parties stipulated that the warrant and the bond on the original petition for a writ of habeas corpus should stand as against the new complaint. On October 22, 1951, the matter was continued to November 5, 1951, for further briefing, which had not then been finished by either party, and on that date it was continued to January 14, 1952, in order that counsel for the various parties might complete their research and file briefs, many documents and materials upon which the parties rely be-

ing either out of print or not available in this community, and available only in the State Department or the Library of Congress. On November 5, 1951, the parties were given thirty days to file their briefs and supporting materials, but the petitioner's was not received until January 11, 1952, and the Yugoslavian briefs were not filed until the morning of the hearing on January 14th, 1952.

In recognition of the difficulties of research, the seriousness of the questions involved and the consequences of any judgment of this court, the parties have thus been allowed full opportunity for research, briefing and hearing.

█ In consideration of the petition for the writ filed, as it was, prior to the hearing before the Commissioner, this Court is limited in its inquiry to whether the Commissioner has jurisdiction. Wright v. Henkel, 1903, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948; In re Mitchell, D.C. 1909, 171 F. 289.

█ In the consideration of that question, ordinary technicalities of pleading are applicable only to a limited extent, but are entitled to respectful notice. Grin v. Shine, 1902, 187 U.S. 181, 23 S.Ct. 98, 47 L.Ed. 130; Glucksman v. Henkel, 1911, 221 U.S. 508, 31 S.Ct. 704, 55 L.Ed. 830. The pleadings must, however, conform to the pleading rules of the State of California, the law of the place where the petitioner was

hearing is continued to and set for October, 8, Monday, at 10:00 o'clock in the morning.

"Now as to the amount of bail. The petitioner suggested $50,000 bail. It seems to me to be a rather large sum in view of the $1000 bail set in the immigration proceedings. However, in view of the fact that it was suggested by petitioner's counsel, I think that that should be the amount of bail.

"I will therefore fix the bail of the defendant at $50,000 and I will indicate to counsel that I will not approve a corporate bail in this case. It must either be a private bail qualified before the Commissioner or cash bail deposited by private persons.

"Mr. Walker: The conditions of the bail will be the usual ones in a criminal case?

"The Court: The conditions will be that the petitioner will return here on October 8, 1951, that he shall not leave the jurisdiction of this court in the meantime, and that after October 8, 1951, he shall thereafter respond to all further orders of the court which may be made in or about or in connection with these proceedings.

"The condition of the bail will provide that it shall be forfeited to the respondent, the United States of America, or James J. Boyle, United States Marshal, as the appropriate official of the United States."

(This marginal footnote was taken from the transcript of proceedings of September 17, 19, 1951, pages 217, lines 7–10, and page 219, line 23 through page 225, line 8.)

found. Grin v. Shine, supra; In re Ezeta, D.C.N.D.Cal. 1894, 62 F. 972.

The questions involving jurisdiction reduce themselves to two, which, broadly stated are: (1) whether or not the extradition treaty with the Kingdom of Serbia of 1902 is an extradition treaty and in existence between Yugoslavia and the United States, and: (2) if such treaty is in force, whether or not the amended complaint as it now stands states an extraditable offense on its face.

It is conceded by all parties that on May 17, 1902, an extradition treaty between the United States of America and the Kingdom of Serbia was proclaimed to be in effect after ratification by the Senate of the United States on January 27, 1902, ratification by the President on March 7, 1902, ratification by Serbia on March 17, 1902, and an exchange of ratifications at Belgrade on May 13, 1902. The pertinent provisions of the treaty are set forth in the marginal footnote No. 2, ante. It is likewise conceded, that no other treaty of extradition has been entered into since then, either with the Serb-Croat-Slovene State, or Yugoslavia, or the Federal People's Republic of Yugoslavia.

But the petitioner contends that the Kingdom of Serbia has long since ceased to exist as a "foreign country" or as a "state" or independent sovereignty; that "such foreign government" as that term is used in Section 3181 of Title 18 U.S.C., i.e., the government of the Kingdom of Serbia in 1902 has likewise long ceased to exist; that the foreign country, i.e., Yugoslavia, seeking extradition is an entirely different "foreign country" than the Kingdom of Serbia; that the government of Yugoslavia is an entirely different "foreign government" than the government of the Kingdom of Serbia in 1902 as it existed at the time of the treaty; that there has not been the continuity of either the country or the government which will permit it to be said that they are the same; that if there has been such continuity, the government of Yugoslavia has renounced the treaty; that the statement by the State Department of the United States and of the Yugoslavian Ambassador that the treaty is in force is a mere fiat [5] and is not in compliance with

5. Department of State Bulletin, Vol. XIII, No. 339, p. 1020. "Recognition of New Yugoslav Regime [Released to the press December 22] "Instruction sent to the American Ambassador in Belgrade "The Yugoslav Ambassador on December 10 transmitted to the Secretary of State the following communication: " 'The Ambassador of Yugoslavia presents his compliments to the Honorable the Secretary of State and has the honor to notify the Government of the United States of America that the Yugoslav Constituent Assembly in the session of the 29th of November 1945, in accordance with the freely expressed will of the peoples of Yugoslavia, in the name of the people and in the name of the legal decisions taken by both houses of the Constituent Assembly, proclaimed Democratic Federative Yugoslavia a people's republic with the name "Federative People's Republic of Yugoslavia." By the same decision the monarchy has been abolished and Peter Karadjordjevic together with the entire Karadjordjevic dynasty deprived of all rights previously vested in him and in his dynasty. " 'On the 1st of December, 1945, the Constituent Assembly enacted the law of the Presidium of the Constituent Assembly. Under this law the Presidium of the Constituent Assembly is elected by both houses and consists of one president, six vice presidents, two secretaries and a maximum of thirty members. According to paragraph three of said law the Presidium, among other executive functions, represents inside and outside the country, the sovereignty of the people and of the state as the Federative People's Republic of Yugoslavia. The Presidium appoints the ambassadors, plenipotentiary ministers and extraordinaire envoys to foreign countries at the proposal of the Federative Government. The Presidium receives the credentials of the diplomatic representatives of foreign countries. According to paragraph six, when the Constituent Assembly becomes the regular Assembly the Presidium of the Constituent Assembly ipso facto becomes the Presidium of the regular Assembly. This law became effective on adoption by the Constituent Assembly the 1st of December, 1945. " 'In accordance with this law, the Presidium of the Constituent Assembly was elected as follows: President: Ivan Rybar, former president of the Provision-

the constitutional requirement that treaties with foreign states be submitted to the Sen-ate for ratification before they become effective; and that no such treaty has either

al Assembly; Vice Presidents: Mosa Pijade, Filip Lakus, Josip Rus, Djuro Pucar, Dimtri Vlahov and Marko Vujacic; Secretary: Milo Perunicic.'

"The following reply dated December 22 has now been communicated to the Ambassador:

" 'The Acting Secretary of State presents his compliments to His Excellency the Ambassador of Yugoslavia and has the honor to inform the Ambassador that the United States Government, having taken note of the contents of the Ambassador's communication No. A. Br. 1070 of December 10, 1945, recognizes the changes which have taken place in the constitution of Yugoslavia and the establishment of a republic under the name "Federative People's Republic of Yugoslavia" in accordance with decisions of the Constituent Assembly referred to therein.

" 'It is assumed that, pursuant to international custom, the new Yugoslavia Government will, as a member of the family of nations and as one which has subscribed to the principles of the Declaration by the United Nations, accept responsibility for Yugoslavia's international obligations, and be disposed to confirm its continued recognition of the existing treaties and agreements between the United States and Yugoslavia. Upon receipt of assurances in this sense, the United States Government is prepared to proceed with the issuance of appropriate letters of credence accrediting the United States Ambassador in Belgrade to the new Yugoslav regime.'

"Mindful of the obligations which it assumed at Yalta, the United States Government has consistently made known its attitude that the people of Yugoslavia are entitled to expect the effective implementation of the guarantees of personal freedom, freedom from fear, liberty of conscience, freedom of speech, liberty of the press and freedom of assembly and association contained in the agreement between Marshal Tito and Dr. Subasic underly the Yalta Declaration and to have an opportunity to express their will in a free and untrammeled election. In view of conditions existing in Yugoslavia, it cannot be said that those guarantees of freedom have been honored nor that the elections conducted on November 11 provided opportunity for a free choice of the people's representatives. In the circumstances the United States Government desires that it be understood that the establishment of diplomatic relations with the present regime

in Yugoslavia should not be interpreted as implying approval of the policies of the regime, its methods of assuming control or its failure to implement the guarantees of personal freedom promised its people. You should make it quite clear to the authorities and people of Yugoslavia that we entertain only the friendliest sentiments toward the peoples of the country and that it is our anticipation that the evolution of events will provide developments which will make possible those relations—both political and economic—between the peoples of Yugoslavia and the United States which we on our part most urgently desire to see."

Department of State Bulletin, Vol. XIV, No. 356, p. 728.

"Establishment of Diplomatic Relations with Yugoslavia

"Notes from the Secretary of State to the Yugoslav Chargé d'Affaires

"[Released to the press April 17]

"The following two communications were delivered to the Yugoslav Chargé d'Affaires ad interim on April 16, 1946

" 'The Secretary of State presents his compliments to the Chargé d'Affaires ad interim of the Federal People's Republic of Yugoslavia and acknowledges receipt of the latter's communication No. 407 of April 2, 1946 in which, acting upon instructions, the Chargé d'Affaires informed the Secretary of State that "the Government of the Federal People's Republic of Yugoslavia, after having studied all the questions concerning the recognition of Yugoslavia's international obligations in conformity with the decisions of the Second Session of the Anti-Fascist Council of National Liberation in Jajce in November, 1943, hereby gives an affirmative answer to the note of the Department of State of December 22, 1945, concerning the international obligations of the former Yugoslav Governments."

" 'The Secretary of State is gratified to receive this assurance that the Federal People's Republic of Yugoslavia confirms its continued recognition of the existing treaties and agreements beween the United States and Yugoslavia and accordingly, pursuant to his communication of December 22, 1945 referred to above, requests that the Chargé d'Affaires inform the Yugoslav Government that the United States Government is now prepared to proceed with the issuance of appropriate letters of credence accrediting the United States Ambassador to the Federal People's Republic of Yugoslavia.'

" 'Sir: I refer to your note of March

been negotiated with Yugoslavia or submitted to the Senate of the United States for ratification or approval.

It is contended, among other things, by the respondent Marshal and the demanding government that the determination of whether a treaty is in existence is purely a political one to be determined exclusively by the Executive Department of the Government, and that no court has any power to inquire into that decision and that in any event, the treaty of 1902 is in force.

As seen from footnote 5, on April 16, 1946, after an exchange of correspondence with the present Yugoslavian government and the State Department of the United States, the Yugoslavian government stated: "Pursuant to international custom the new Yugoslavian government will assume responsibility for Yugoslavia's international obligations and be disposed to confirm its continuing recognition of the existing treaties and agreements between Yugoslavia and the United States," to which the Secretary of State of the United States replied in part:

"The Secretary of State is gratified to receive this assurance that the Federal People's Republic of Yugoslavia confirms its continuing recognition of the existing treaties and agreements between the United States and Yugoslavia * * *" and then proceeded to and did receive an ambassador from Yugoslavia in recognition of that government.

It is contended by the respondents that such exchange between the State Department and Yugoslavia did two things: (1) recognized Yugoslavia as a foreign state, and, (2) decided that the treaty with Serbia of 1902 was an "existing treaty * * * between the United States and Yugoslavia."

█ Whether or not a foreign government is one which shall be "recognized" as the one with which the United States shall treat as the government of a foreign state is a question which undoubtedly lies in the exclusive decision of the Executive Department. The Sapphire, 1870, 11 Wall. 164, 78 U.S. 164, 20 L.Ed. 127; The Rogdai, D.C. Calif. 1920, 278 F. 294; Lehigh Valley etc. v. State of Russia, 2 Cir., 1927, 21 F.2d 396; Guaranty Trust v. United States, 1938, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224.

I come then to the contention by respondents that the State Department by its statement concerning "continuing recognition of existing treaties and agreements between the United States and Yugoslavia" and that the treaty is in "force"[6] is a final

1, 1946 in which you state that the Yugoslav Government desires to appoint Mr. Sava N. Kosanovic as Ambassador Extraordinary and Plenipotentiary of Yugoslavia to the United States.

"The appointment of Mr. Kosanovic in the above-mentioned capacity is agreeable to this Government.

"'Accept [etc.]

"James F. Byrnes'"

6. "No. 4096

"The Ambassador of the Federal People's Republic of Yugoslavia presents his compliments to the Honorable the Secretary of State and has the honor to refer to the note of his predecessor of July 23, 1946, No. 1034 concerning the extradition of certain war criminals of Yugoslav origin.

"In the mentioned note was requested, among others, the extradition of Dr. Andrija Artukovic, former Minister of Interior in the Quisling Ustashi Government, created by the Axis Powers in Croatia during the war. At the time of

presenting the note Dr. Artukovic was believed to be somewhere in occupied Austria or Italy.

"According to latest available information the present whereabouts of the mentioned war criminal is in Los Angeles, California, U.S.A., where he is employed with the road construction enterprise 'P & I Artukovic Co., Inc.' 13305 San Pedro Street or 'General Contractors,' 1335 South Avalon Avenue, both in Los Angeles, California. In addition, his private address is 62 Surfside Colony, Long Beach, California. Living in Los Angeles, unhidden, under his true name, Dr. Artukovic, in the capacity of employee of the said companies, signs checks by his full name.

"The mentioned Dr. Andrija Artukovic has been proclaimed a war criminal for the following crimes: betrayal of the people; assassinations and massacres; looting; large-scale torturing and ill-treatment in concentration camps; organization of armed struggle against the

·decision that the treaty between the United States and the Kingdom of Serbia of 1902 is in existence, and not reviewable, and that the court cannot inquire into the existence of the treaty; but which the petitioner contends is beyond the constitutional power of

Allied and the National Liberation Army of Yugoslavia; military, political and economic collaboration with, and service rendered to, the enemy. This will be seen from the enclosed 'Decision on the Ascertainment of Crimes of Invader and Its Helpers' Zh. No. 9948, 6166, F. No. 3371/II of the Federal State of Croatia Land Commission for the Ascertainment of Crimes of the Invader and Its Helpers of December 1, 1945, confirmed by the State Commission of Yugoslavia for the Ascertainment of Crimes of the Invader and Its Helpers of December 27, 1945.

"In view of the fact that Dr. Andrija Artukovic has been one of the most notorious war criminals, responsible for innumerable and unheard-of crimes committed upon the people of Yugoslavia during the last war, the Ambassador of the Federal People's Republic of Yugoslavia has the honor to reiterate the request that immediate steps be taken by the United States authorities with a view to apprehending the said war criminal and handing him over to the Yugoslav authorities for trial and punishment, well deserved long ago.

"In reiterating this request the Ambassador of the Federal People's Republic of Yugoslavia is confident that the United States Government, guided by the principles of the inter-Allied Decisions during the last war, and especially by the Moscow Declaration of October, 1943, on Bestialities, as well as by the General practice internationally adopted in similar cases, will undertake all the steps necessary to hand over this notorious war criminal to the Yugoslav authorities and, thus, help put him on trial in the country where he committed his abominable crimes.

"The Ambassador of the Federal People's Republic of Yugoslavia avails himself of this opportunity to renew to the Honorable the Secretary of State the expression of his highest esteem.

"Washington, D. C., March 31, 1951.
"The Honorable
The Secretary of State
Washington, D. C."

"The Secretary of State presents his compliments to His Excellency the Ambassador of the Federal People's Republic of Yugoslavia and has the honor to acknowledge the receipt of the Ambassador's note no. 4096 dated March 31, 1951, and of its enclosure, in which the request is made that immediate steps be taken by the United States authorities with a view to apprehending Dr. Andrija Artukovic, and to handing him over to the Yugoslav authorities for trial and punishment.

"The Ambassador is informed that as a result of the circumstances attending Dr. Artukovic's entry into and continued stay in this country proceedings have been instituted in the United States with a view to his deportation. If the deportation of Dr. Artukovic is not effected, the Secretary of State will be pleased to give consideration, after the necessary forms of law have been complied with, to a request from the Ambassador for the extradition of the accused pursuant to the provisions of the Extradition Treaty of October 25, 1901, in force between the United States and Yugoslavia. In this connection it is pointed out that, in accordance with the provisions of Title 18, U.S.C. sec. 3184, extradition from the United States can be effected only on the basis of a treaty or convention of extradition.

"Department of State,
Washington, May 14, 1951."

"The Department of State refers to its note dated May 14, 1951, in the matter of the desired extradition to Yugoslavia of Dr. Andrija Artukovic.

"It is pointed out for the information of the Embassy of the Federal People's Republic of Yugoslavia that it was not intended by the note under reference to imply that it would be necessary for the Embassy to await the outcome of the deportation proceedings instituted against Dr. Artukovic before making a formal request for the extradition of the accused or before a warrant could be obtained for the provisional arrest and detention with a view to the extradition of the accused. The formal request for the extradition of Dr. Artukovic may be filed at any time and, acting in accord with the provisions of Title 18, U.S.C., Section 3184, a duly authorized representative of the Yugoslav Government, possibly one of its Consular Officers in the United States, could be at liberty to swear out a warrant for the arrest of the accused with a view to his extradition notwithstanding that deportation proceedings are pending. The Department of State cannot give any assurance, however, as to what action may be taken following the issuance of such a warrant of arrest

the Executive Department, as hereinbefore set forth.

Article 6, Clause 2, of the Constitution of the United States provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; * * *" Article 3, Section 1, provides: "The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish * * *" and in Section 2 of Article 3: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; * * *" Article 2, Section 1, Clause 1, provides: "The executive Power shall be vested in a President of the United States of America"; and in Section 2, Clause 2: "He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; * * *" and in Section 3 of Article 2, "* * * he shall take Care that the Laws be faithfully executed. * * *"

 Plainly, the President cannot make a treaty without the consent of the Senate. *A treaty when made is a law.* Foster v. Neilson, 1829, 2 Pet. 253, 7 L. Ed. 415. It has been settled since Marbury v. Madison, 1803, 1 Cranch 137, 2 L. Ed. 60, that the power to determine whether a law exists, i. e., whether or not it is constitutional, and to interpret it, is a ju-

dicial power and rests solely in the courts with all the safeguards of review and does not lodge in the *ipsi dixit* of the Executive Department of the government or any branch thereof. See also Youngstown, etc., v. Sawyer, 1952, 343 U.S. 937, 73 S.Ct. 775. Any other conclusion flies not only in the face of the plain words of the constitution, but also in the face of the fundamental concepts of this government: that there shall be and remain three separate and autonomous branches of this government; the Congress to make laws; including the power to make a treaty effective by ratification or non-effective by failure to ratify; the executive to enforce them; and the judicial to interpret them and to determine whether the enactments of Congress are constitutional, as well as to determine whether or not any act of the Executive Department is lawful and not in excess of the powers granted to the Executive by the constitution or any act of Congress. Any other construction would wholly avoid that wise and salutary provision of the Constitution which prevents the private negotiation of treaties by changing Executives and requires rather that they be approved by the Senate after opportunities for the public to know what they are proposed to be committed to, and for public hearing and debate. It is recalled that Point One of Woodrow Wilson's Fourteen Points was that there should be open covenants between states openly arrived at.[7]

Statements in the cases relied on by respondents as being to the contrary are dicta. In those cases, it is noted that wherever the question was raised, the Supreme Court considered and determined

---

since that will be within the jurisdiction of the judicial branch of the Government.

"Finally, the Department of State wishes to point out that except for the possible receipt by it of a formal request for extradition pursuant to the treaty of October 25, 1901, in force between the United States and Yugoslavia, it is without authority to act in the matter until it shall have received from the extradition magistrate a transcript of the proceedings in the hearing required by Title 18, U.S.C., Section 3184.

"Department of State,

Washington, May 21, 1951. 611.6826/3–3151"

7. "Messages and Papers of the Presidents."

Vol. XVII, p. 8421, address to Congress, Jan. 8, 1918.

"The program of the world's peace, therefore, is our program, the only possible program, as we see it, is this: I— open covenants of peace, openly arrived at, after which there shall be no private international understandings of any kind, but diplomacy shall proceed always frankly and in the public view."

whether or not a treaty was in existence. In Terlinden v. Ames, 1902, 184 U.S. 270, at page 282, 22 S.Ct. 484, at page 489, 46 L. Ed. 534, the court stated: "This brings us to the real question, namely, the denial of the existence of a treaty of extradition between the United States and the Kingdom of Prussia, or the German Empire." The court then proceeded to examine the question and concluded that the treaty did exist. It was in connection with a discussion as to whether or not the obligation of the treaty had been observed after the creation of the German Empire that the court made the statement so heavily relied upon by the respondent and the demanding government, found 184 U.S. on page 285, 22 S.Ct. on page 490: "And without considering whether extinguished treaties can be renewed by tacit consent under our Constitution, we think that on the question whether this treaty has ever been terminated, governmental *action* in respect to it must be regarded as of controlling importance. During the period from 1871 to the present day, *extradition from this country to Germany, and from Germany to this country, has been frequently granted under the treaty*, which has *thus* been repeatedly recognized by both governments as in force." (Emphasis supplied) It is noted that the court referred to governmental *action*, not declarations, opinions, statements or mere correspondence by the executive department; and that the court interpreted the word "action" as it is used, to mean the actual extradition of persons from each country to the other.

In the instant case, although ample opportunity has been given counsel, not one single instance of extradition under the Serbian Treaty of 1902, since the conclusion of the first World War has been called to the Court's attention, and for that matter not one single instance of extradition under the treaty since its effective date in 1902.

In The Disconto Gesellschaft v. Umbreit, 1908, 208 U.S. 570, 28 S.Ct. 337, 52 L.Ed. 625, the court assumed the treaty involved to be in force. The parties did not challenge the existence of the treaty, but made certain contentions concerning its interpretation.

In Charlton v. Kelly, 1913, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274, the question was whether or not Italy by its conduct which was contended to be in abrogation of the treaty of extradition, would justify the United States in refusing extradition. The whole controversy revolved around the meaning of the word "persons" in the treaty. Italy had held that it did not mean her citizens, but the court held, in line with the views of the State Department, that the word "persons" included citizens of the United States. It was thus a question of interpretation and not a question of the existence of the treaty.

Coleman v. Miller, 1939, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385, involved the right of persons to restrain the officers of Congress from certifying to the passage of the child labor amendment by the State of Kansas, and had no question whatsoever of treaties or foreign relations.

Clark v. Allen, 1947, 331 U.S. 503, 67 S. Ct. 1431, 91 L.Ed. 1633, is cited in support of the contention that the question of the existence of treaties is exclusively one for the State Department and not for the courts. The portion of the opinion relied upon is on page 514, of 331 U.S., and on page 1431 of 67 S.Ct., but with the italics and quotation as follows, it is apparent that the case does not go that far:

"It is argued, however, that the Treaty of 1923 with Germany [44 Stat. 2135] must be held to have failed to survive the war, since Germany, as a result of its defeat and the occupation by the Allies, has ceased to exist as an independent national or international community. But the question whether a state is in a *position to perform* its treaty obligations is essentially a political question. Terlinden v. Ames, 184 U.S. 270, 288, 22 S.Ct. 484, 491, 46 L.Ed. 534. *We find no evidence* that the political departments have considered the collapse and surrender of Germany as putting an *end to such provisions of the* treaty as survived the outbreak of the war or the obligation of either party in

respect to them. The Allied Control Council has, indeed, assumed control of Germany's foreign affairs and treaty obligations—a policy and course of conduct by the political departments wholly consistent with the maintenance and enforcement, rather than the repu- diation, of pre-existing treaties."

The case did not involve extradition, but rather involved the right of nationals and residents in Germany to take property[8] left by Alvina Wagner in her will. The Alien Property Custodian had vested in himself all the property of the German nationals. It is also noted that the court examined the question of the existence of the treaty and did not accept the contentions or the conclusions of the State Department carte blanche.

■ I conclude, therefore, that the question of whether or not a treaty exists between the United States and Yugoslavia is not a matter which lies exclusively within the Executive Department but is a judicial question to be decided by the courts.

I come now to the question as to whether or not the treaty with Serbia of 1902 is a treaty in existence with Yugoslavia.

In the consideration of that question the court is limited to such factual matters of which judicial notice may be taken and such matters as were put in evidence on the hearing which do not bear upon the conduct of the petitioner with relation to the charges in the complaint.

In doing so, it is necessary to judicially notice [9] some of the history of Croatia and other Balkan countries, without reviewing all the events which have arisen in the Bloody Balkan Cauldron (the historic battle ground between eastern and western civilization) and played their part in world events.

The petitioner was born in Klobuk, a town in Croatia in the year 1900. At that time Croatia was a separate state but a part of the Austro-Hungarian Empire and had been for several hundred years. Slovania, Herzgovnia, Dalmatia and Bosnia (later also to become part of the Serb-Croat-Slovene State) were also then a part of the Austro-Hungarian Empire. Turkey maintained a sort of dual sovereignty over Bosnia with the Sultan as a nominal sovereign, but the government being actually administered by an Austro-Hungarian Minister of Finance. Turkey ruled Albania, later to be a separate kingdom, as well as Macedonia, later to become a part of Greece. Prior to the first World War Croatia had had for a number of

---

8. Karnuth v. United States, Ex rel. Albro, 1929, 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677. Id. 2 Cir., 24 F.2d 649, Extradition to Canada under the Jay Treaty with Great Britain made in 1794.

The court held that the War of 1812 abrogated the treaty, citing Society for the Propagation of the Gospel v. New Haven, 8 Wheaton 464, 5 L.Ed. 662, in certain aspects, but it was not *abrogated if it dealt with property*, that is, permanent rights to property, but was abrogated in connection with its terms relating to immigration, even though until the question was raised, people had passed freely between Canada and the United States.

9. In connection with the historical matters referred to in this memorandum reference has been made to the following:

New International Encyclopedia, Second Edition, 1915;

Encyclopedia Britannica, Editions 1902, 1929, and 1952 (Serbia; Yugoslavia; Balkan Peninsula; Croatia; Bosnia; Herzgovnia; Austria-Hungary; Germany; Turkey; Bulgaria.)

Universal Encyclopedia & Atlas, Appleton & Co., 1903;

Foreign Relations of the United States, 1919, Vol. II;

The Treaty of Versailles and After, as published by the State Department, 1947, Department of State Publication No. 2724;

Messages and Papers of the Presidents, published by Bureau of National Literature, Inc.;

Report of the Committee on Foreign Relations of the Senate of the United States, dated September 10, 1919;

Select Constitutions of the World by Dail E. Ureann, 1922; Esson & Son, Dublin;

League of Nations Journal, 1920, No. 8;

Senate Document No. 7, 67th Congress, First Session;

Foreign Relations of the United States, 1919, Vol. II, Pub. No. 661, p. 892, et seq.

years a separate diet and sent delegates to the Hungarian Parliament in Budapest. Croat was the official language. Its judicial system was entirely autonomous as well as its "home" department. Its foreign affairs were handled by Austria-Hungary. This continued until the commencement of the first World War following the assassination of Archduke Ferdinand of Austria in Sarejevo, Bosnia, on June 28, 1914. During all this period of time Croatia was no part of and had no alliance with Serbia. The entire period during which Croatia was a part of the Austro-Hungarian Empire was marked by efforts to secure greater autonomy and independence if possible. Turkey had in fact ruled many parts of the Balkans for several hundred years. From October 1912 to May 1913 a war was fought between Bulgaria, Serbia, Greece and Montenegro on the one hand and against Turkey on the other, which then almost embroiled the whole of Europe. But with the intervention of Germany, Russia and Austria-Hungary a peace was made which forced Turkey out of Europe except for Constantinople and a small area around it and which resulted also in the return of Macedonia to Greece and in the creation of the Kingdom of Albania. But even so, in July 1913 following the conclusion of that peace, Bulgaria started hostilities against her former allies, Serbia, Greece and Montenegro. One month, (July 29, 1914), after the killing of Archduke Ferdinand, Austria-Hungary declared war on Serbia, which was followed the same day by a declaration of war by Germany on Russia, and in turn in quick succession Germany marched on France and Belgium; Turkey declared war, so that with the declaration of war by England on August 4, 1918, World War I was on its way.

During that war Serbia cast its lot with the Allies but Croatia was part and parcel of the Central Powers, and its armies fought with them. Albeit there was a committee set up in London early in the war of Croats, Serbs and Slovenes *residing within* Austria-Hungary, whose program was complete independence and union with Serbia.

The Croatian diet, meeting in Zagreb, the capital of Croatia, refused to disavow that committee.

As the fuse which exploded World War I was lighted in the Balkans, so it was that the first sign of its smothering occurred in the Balkans with the surrender of Bulgaria on September 29, 1918.

Almost immediately following the surrender of Bulgaria a council was set up which consisted of Croats, Slovenes and Serbs, *residing within the boundaries of the former Austro-Hungarian Empire*. This council later included representatives from the Kingdom of Serbia. On October 10, 1918, its headquarters were established at Zagreb in Croatia. On October 23, 1918, a Croatian regiment took possession of Fiume and promptly recognized the authority of the council. Following that, and on October 29, the Croatian diet declared the independence of Croatia from Hungary and among other things, invited the help of the Serbian Army. On November 11, 1918 the Armistice between the Central Powers and the Allies was signed in France. On November 23, 1918, the union of Croatia, Bosnia, Herzgovnia, all formerly a part of the Austro-Hungarian Empire, was resolved in Zagreb by the above mentioned Council. About that time, the Serbian Chargé d'Affaires in Washington addressed a note to the Secretary of State of the United States. On the 26th of November, 1918, Montenegro, a separate state, declared itself independent of the dynasty of Nikolas, its then king, and its desire to be united with Serbia in a Serb-Croat-Slovene State. On December 1, 1918, Alexander of Serbia was invited by the above mentioned council to proclaim the Union of the Serbs, Croats and Slovenes, *living within the boundaries of the former Austrian-Hungarian monarchy*, with Serbia. On December 24, 1918, Alexander proclaimed "our first State Government." In February 1919 the United States recognized the Serb-Croat-Slovene State as consisting of "all the Serbian, Croatian and Slovene provinces *within* the countries of the former Austro-Hungarian Monarchy and Montenegro."[10]

10. "Foreign Relations of the United States, 1919, Vol. II, Publication No. 661, Department of State, Government Printing Office, 1934.

If the treaty of 1902 did not become effective as between the "First State Government" of the Serb-Croat-Slovene State formed in 1919, then it did not carry through to the country now known as Yugoslavia, so at this point I consider it is un-

" 'Yugoslavia
" 'Recognition by the United States of the Kingdom of the Serbs, Croats and Slovenes, February 7, 1919
"860h.01/23
" 'The Serbian Chargé' (Simitch) to the Secretary of State
"No. 176 Washington, November 11, 1918
" 'Your Excellency: I have the honor to inform Your Excellency that the Serbian Government has recognized the National Council in Zagreb as the legitimate representative of the Serbians, Croatians, and Slovenes who are *residing within the boundaries of the former Austro-Hungarian Monarchy* until the *definite organization of one state* which will comprise all Serbians, Croatians and Slovenes, when the Serbian Government and the National Council will create one common government who will protect the rights of the nation of all Serbians, Croatians and Slovenes.

" 'Until the organization of this Government Mr. Troumbitch, President of the Jugoslav Committee in London, has been entrusted with the mandate to represent the National Council in Zagreb with the Allied Governments.

" 'In bringing the above to the knowledge of Your Excellency I beg to present that the Serbian Government anticipates that the United States Government will recognize the National Council in Zagreb, the members of whom have been elected by the parliament, as the legitimate government of the Jugoslavs (Serbians, Croatians and Slovenes,) *living within the boundaries of the former Austro-Hungarian Monarchy*, and consider that government and its army as an ally.

" 'With renewed assurance [etc.]
" 'Y. Simitch' "

"860h.01/21
"The Serbian Chargé (Simitch) to the Acting Secretary of State
[Translation]
" 'Washington, undated.
" '[Received January 6, 1919.]
" 'Mr. Secretary: I am instructed by my Government to submit herewith the following communication:

" 'In accordance with the decision of the Central Committee of the National Council of Zagreb which represents the *State of all the Serbian Croatian and Slovene provinces within the boundaries of the former Austro-Hungarian Monarchy*, a special Delegation has ar-

rived at Belgrade on the 1st of December. This Delegation by one [a] solemn address, presented to His Highness the Crown Prince, has proclaimed the Union of all the Serbian Croatian and Slovene provinces of the former Dualist Monarchy *into one single State with the Kingdom of Serbia* under the Dynasty of His Majesty King Peter and under the regency of the Crown Prince Alexander. In the reply to this address His Royal Highness the Crown Prince has proclaimed the Union of Serbia with the above mentioned independent State of Slovenes, Croats and Serbs into one single Kingdom: "Kingdom of the Serbs, Croats and Slovenes." His Highness has accepted the regency and will form a common Government. On the 17th of December His Royal Highness the Crown Prince received in audience a delegation from Montenegro. This Delegation has submitted to His Highness on the 26th of November the decisions of the Great National Assembly of the Kingdom of Montenegro. By virtue of these decisions His Majesty King Nikolas I, and His dynasty have been declared destitute of all the rights upon [to] the throne of Montenegro and the Kingdom of Montenegro, united to Serbia under the dynasty of Karageorgevitch, is included in the Kingdom of the Serbs, Croats and Slovenes. His Royal Highness the Crown Prince has declared that He accepts with pleasure and thanks these decisions. A common Government for the new Kingdom has been organized on the 21st of December. The Legations, Consulates and other Missions of the Kingdom of Serbia will be the Legations, Consulates and other Missions of the Kingdom of the Serbs, Croats and Slovenes.

" 'Bringing the above to the knowledge of the United States Government, the Serbian Government is strongly convinced that their communication will be met sympathetically:—The Union of all the nations of the Serbs, Croats and Slovenes in one single state, which results from the imprescriptible right of the people to dispose of their destiny.
" 'I take [etc.]
" 'Y. Simitch' "

"860h.01/29
"The Chargé in Yugoslavia (Dodge) to the Acting Secretary of State
" 'No. 147 Belgrade, January 10, 1919.
" '[Received February 11]

necessary to trace the history of the unfortunate Balkans since the beginning of the second World War.

"'Sir: I have the honor to enclose to you herewith a clipping from the Pravda of the 26th. December/8th. January giving the text of a proclamation addressed on Christmas Day, old style, by the Prince Regent to the Serb, Croat and Slovene people. I also enclose a translation which I have made from a French translation of this proclamation.

"The proclamation will be found to be of considerable interest as it outlines the future plans of the Government. These in general outline have already been reported, especially in my Despatch No. 137, of December 24th. After referring to the final union of the Serbs, Croats, and Slovenes in a single Kingdom by the unanimous wish of the people, & mentioning the presentative character of the present Cabinet composed of men of all the political parties, regions, and creeds of the *new State*, the proclamation describes the composition of the provisional body which under the name of "National Council" is to act as a national parliament until a parliament is elected under the Constitution to be framed by the Constitutional Convention. It will be noted that this Council is to include delegates of the various National Councils which exist in each of the Yugoslav provinces of the former Austro-Hungarian Empire and delegates from the Banat and Batschka (the Voivodina). It will also include, from Serbia proper, in addition to delegates of the Skupschtina, delegates from the territories of Old Serbia and Macedonia which were acquired during the Balkan wars. It will be remembered that these territories, while annexed to Serbia, were placed under a special régime and were not allowed to be represented in the Skupschtina. This régime is in fact generally acknowledged to have been harsh and meddlesome.

"The proclamation then declares that the corner-stone of the *new State* and its liberties will be constitutional and parliamentary Government and that the Constitutional Convention will be elected upon a basis of universal suffrage. The Cabinet will submit to the Constitutional Convention a draft for a democratic Constitution on the basis of a unified State with extensive local autonomies and the strictest guaranties for political and personal rights. The future Government is not to be a federal one but a strongly unified State with local

While the demanding government has cited many cases upon which it relies to support its contention that the treaty with

autonomies. As formerly reported, there appears to have been from the beginning little popular sentiment in favor of a federal form of Government although it is generally stated that local autonomy in the *new State* will be more extensive than it has been in Serbia. The chief reason given for desiring a centralized State is in order that it may be stronger in a military sense as it will have enemies in Germany and Hungary.

"'All the liberties and rights now given to the population of Serbia by its Constitution are to be extended over all the *new Kingdom*. This will be a distinct democratic gain in the former Austro-Hungarian provinces where much of the present legislation is aristocratic and even feudal in character. This is especially true in Croatia and especially as regards the land laws which favor large estates. Many of these are of vast extent (as those of the Odescalchi family) and the peasants living in them are little better than serfs. The recent unrest in Croatia is largely economic in character and owing to the desire of the peasants to acquire the land which they till. In Serbia the reverse is the case and in fact the whole country is one of peasant proprietors.

"The proclamation also refers to the duty of the Government to relieve the present distress, to care for the victims of the war and to reconstruct the country. It calls upon the people to forget their differences and to trust and support the Government in order that the Government may inspire confidence abroad and be able to obtain its true ethnographic frontiers. In describing the extent of these frontiers "unquestioned sovereignty" is mentioned "from one end to the other of our sea." This phrase may be considered somewhat unfortunate but from what I have been told by persons in authority, it should in no way be taken as signifying more than a desire for the ordinary rights of a nation having a seacoast.

"'I have been assured lately by several prominent political men, including the Acting Minister for Foreign Affairs, Dr. Gavrilovitch, that the Cabinet is strongly opposed to including in the Kingdom any territories not peopled by Serbs, Croats and Slovenes, especially owing to the danger which this would cause to the Kingdom. Where this appears to be a necessity, as in the case of the Italian

*Serbia of 1902* is in force at present, the principal reliance is placed on Terlinden v. Ames, 1902, 184 U.S. 270, 22 S.Ct. 848, 46 L.Ed. 534. However, that case loses its authority upon examination of it and the treaties which it construed. That case, as

populations of Fiume and Zara, the fullest educational and language liberties would be given.

" 'Certain of the measures mentioned in the Prince Regent's proclamation have already been executed. The National Council has already been chosen and is expected to meet about March 1st. The Skupschtina which has held a short session, has elected the Serbian delegates and adjourned, presumably to meet no more. A special Ministry has been appointed for preparing for the coming Constitutional Convention, as has already been reported, and is stated to be already engaged in drafting an electoral law for this Convention and considering plans for a Constitution. A decree has already been published extending to all the Kingdom the rights and liberties enjoyed in Serbia. Regarding the relief of the indigent population and reconstruction however, little has yet been done. Lack of funds is partly responsible for this, lack of efficient administrative personnel and a certain weariness and demoralization after six years of exhausting warfare. The Croatians show more ability in such measures than the Serbs, owing to their having suffered less and possessing more administrative ability. It is however a herculean task and it is especially unfortunate that it must be accomplished at a time when so many matters of absorbing political importance are forcing their solution. Without substantial foreign assistance, proper relief and reconstruction will be beyond the Government's powers.

" 'While adding that I have sent a copy of this Despatch to the Secretary of State in Paris, I have [etc.]

" 'H. Percival Dodge' "

"Yugoslavia 899
"860h.01/26: Telegram
"The Commission to Negotiate Peace to the Acting Secretary of State

" 'Paris, February 6, 1919, 4 p.m.

" '[Received February 7, 1.32 a.m.]'

"622. The Secretary of State will give out on February 7th the following statement in regard to the union of the Jugo Slav peoples, which you may give out to the press immediately:

" 'On May 29, 1918, the Government of the United States expressed its sympathy for the nationalistic aspirations of the Jugo Slav race and on June 28 declared that all branches of the Slavish race should be completely freed from German and Austrian rule. After having achieved their freedom from foreign oppression the Jugo Slav[s] formerly under Austro-Hungarian rule on various occasions expressed the desire to unite with the Kingdom of Servia. The Servian Government on its part has publicly and officially accepted the union of the Serb, Croat and Slovene peoples. The Government of the United States, therefore, welcomes the union while recognizing that the final settlement of territorial frontiers must be left to the Peace Conference for determination according to desires of the peoples concerned.'

"All this statement has been transmitted Mr. Trumbitch and telegraphed to Dodge at Belgrade.

"Am[erican] Mission"

"860h.01/21
"The Acting Secretary of State to the Yugoslav Minister (Grovitch)

" 'No. 2 Washington, February 10, 1919.

" 'Sir: I have the honor to acknowledge the receipt of an undated Note from the Serbian Chargé d'Affaires stating that in accordance with a decision of the Central Committee of the National Council of Zagreb, representing the *State of all the Serbian, Croatian and Slovene provinces within the boundaries of the former Austro-Hungarian Monarchy,* the Serbian Crown Prince has proclaimed the union of all the Serbian, Croatian and Slovene provinces of the former Dualist Monarchy with the *Kingdom of Serbia* in a single state all under the title of "Kingdom of the Serbs, Croats and Slovenes" under the rule of His Majesty King Peter and the regency of the Crown Prince Alexander.

" 'The Department further notes the statement contained in the Note that in accordance with the decision of a body proclaiming itself the Great National Assembly of the Kingdom of Montenegro, His Majesty King Nikolas I, and His dynasty, had been deposed from the throne of that country and had decreed the union of Montenegro with the Kingdom of the Serbs, Croats and Slovenes, and that this decision had been accepted by His Royal Highness the Crown Prince of Serbia.

" 'The Department further notes the statement that the Legation of Serbia in the United States will, hereafter, be known as the Legation of the Kingdom of the Serbs, Croatians and Slovenes.

" 'In reply I have the honor to inform you that the Government of the United

well as all of the other cases upon which the plaintiffs rely must be read in light of Valentine v. U. S. ex rel. Neidecker, 1936, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5, where the court had under discussion the treaty of extradition with France of 1909, 37 Stat. 1530. The petitioner there was a native-born citizen of the United States. The treaty contained the following language: "Article V. Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention", but omitted a clause which had been found in previous treaties reading as follows: "But they shall have the power to deliver them up if in their discretion it be deemed proper to do so." It was argued that the language of the above quoted provision of Article V of the Treaty with France of 1909 by implication carried the power contained in the last quoted clause from previous treaties. As to that contention the Supreme Court held that the representatives of the United States were assumed to have the clauses of the previous treaties before them when they negotiated the treaty of 1909 with France and that the omission was deliberate.[11]

It must be assumed, therefore, that when the treaty with Serbia of 1902 was negotiated that the representatives of the United States had before them the clauses of the previous treaties and particularly had before them the clauses in extradition treaties and the treaty involved in Terlinden v. Ames.

The treaty involved in Terlinden v. Ames was the treaty of July 16, 1852, 10 Stat. 964. It provided in Art. 1 thereof as follows: "It is agreed that the United States and Prussia, and the other states of the Germanic Confederation included in, or *which may*

*hereafter accede to this convention, shall"* (italics supplied) deliver up, etc. It further provided by Art. 2 of that treaty that "The stipulations of this Convention shall be applied to *any other State of the Germanic Confederation, which may hereafter declare its accession thereto."* It is noted that several such accessions were declared and recognized by the United States as will be found by examining the several proclamations following the text of the treaty in 10 Stat. 964. Thereafter, and as a result of the Peace of Prague of 1886 a new North German Confederation came into being and in 1867 the diet of the new North German Confederation proclaimed a constitution which constitution later became the basis of the German Empire. There was negotiated a subsequent treaty, 15 Stat. 615, between Prussia in the name of the North German Confederation and the United States in 1868. It is noted that that treaty had a specific provision in it, in Art. 3, which ratified the previous treaty of 1852 in the following language: "The convention for the mutual delivery of criminals, fugitives from justice, in certain cases, concluded between the United States on the one part and Prussia and other States of Germany on the other part, the sixteenth day of June, one thousand eight hundred and fifty-two, is hereby extended to all the States of the North German Confederation."

In 1870 the Franco-Prussian War occurred and during that war, and in April 1871, the Constitution of the German Empire was proclaimed which was substantially the same as that of the North German Confederation previously proclaimed in 1867. So that historically the actual difference between the North German Confeder-

State welcomes the union of the Serbian, Croatian and Slovene provinces within the boundaries of the former Austro-Hungarian Monarchy to Serbia and recognizes the Serbian Legation as the Legation of the Kingdom of the Serbs, Croatians and Slovenes.

" 'In taking this action, however, the United States Government recognizes that the final settlement of territorial frontiers must be left to the Peace Con-

ference for determination according to the desires of the peoples concerned.
" 'Accept [etc.]
" 'Frank L. Polk' "
(Emphasis supplied)

11. Valentine v. U. S. ex rel. Neidecker, 1936, 299 U.S. 5, at page 13, 57 S.Ct. 100 at page 104, 81 L.Ed. 5:

"We must assume that the representatives of the United States had these clauses before them when they negotiated

ation and the German Empire, so far as the treaties of 1852 and 1868 are concerned, was not much more than the change of name from the North German Confederation to the German Empire.

No provision is found in the treaty with Serbia of 1902, as that which existed in the treaties under consideration in Terlinden v. Ames, extending the terms to additional territory. And it must be assumed that had the parties intended that the extradition treaty with Serbia of 1902 should apply to persons residing in territories which might subsequently come under the jurisdiction or soverçignty of Serbia, that the parties would have specifically stated that in the treaty. The omission cannot be supplied by either Executive or Judicial construction.

This alone is sufficient in my judgment to compel the conclusion that the treaty of Serbia did not survive the series of events following the first World War so far as to cover Croatia, Bosnia, Herzgovnia, Dalmatia, Montenegro, or any of the territories or peoples within them which became a part of the Serb-Croat-Slovene State when that state was created in 1919.

Furthermore, it is historically highly unlikely that such a provision would have been put in the treaty with Serbia of 1902 in view of the turbulence which had for many years existed in the Balkans, and in view of the then policy of the United States of non-intervention in the internal affairs in Europe. Serbia had long been a part of the Ottoman Empire, having attained complete independence only twenty-two years before in 1878, by the Treaty of Berlin, and declared itself a Kingdom March 6, 1882. At the time of the negotiation of the treaty in 1902, Croatia and Slovenia, Bosnia, Herzgovnia and Dalmatia which later became part of the Kingdom of the Serbs, Croats and Slovenes, were a part of the Austro-Hungarian Empire, with a sort of dual sovereignty over Bosnia between Turkey and Austria-Hungary. Turkey ruled Albania, later to be a separate kingdom, as well as Macedonia, later to become a part of Greece.

There had been constant tension, assassinations, insurrections, revolutions, wars, changes in territories and boundary lines, and conflicts of every nature and description going on for several hundred years in the Balkans, [12] and it is highly unlikely that the United States would at that time have stuck its thumb into the Balkan bees nest with the countenance of any language which could be taken as a suggestion that territory should be taken from Turkey or Bulgaria, or Italy, or the Austro-Hungarian Monarchy, to be ultimately added to Serbia, as was finally done in 1919 at the end of the first World War.

Moreover, the conception that Yugoslavia, as it now exists, is not a new state but merely a continuation of the existence of the old Kingdom of Serbia as it existed prior to 1902, is not justified in the light of the expressions of the times and the events of history following World War I. Reference is made to the statement by Woodrow Wilson on the disposition of Fiume on April 23, 1919. [13]

Again, in the address to the Senate of the United States on the Versailles Treaty, delivered by Woodrow Wilson on July 10, 1919, he states: "There could be no peace until the whole order of central Europe was set right. That meant that *new nations* were to be created—Poland, Czecho-Slovakia, Hungary itself. * * * The Slavs

---

the treaty with France and that the omission was deliberate."

12. Indicative of the unrest prevailing at the turn of the century was the assassination of the King and Queen of Serbia in June 1903.

13. Messages and Papers of the Presidents, Volume XVII, page 8703, where he referred to the fact that the Austro-Hungarian Empire "has gone to pieces and no longer exists. Not only that, but the several parts of that empire, it is agreed now by Italy and all her associates, are to be erected into independent States * * *" and the fact that Fiume must serve as an outlet for "the States of the *new* Jugo-Slav group," and again, (p. 8704) "It is part also of the new plan of European order which centres in the League of Nations that the *new States* erected there shall accept a limitation of armaments," etc. (Emphasis supplied.)

whom Austria had chosen to force into her empire on the south were kept to their obedience by nothing but fear. Their hearts were with their kinsmen in the Balkans. These were all arrangements of power, not arrangements by natural union or association. It was the imperative task of those who would make peace and make it intelligently to establish a *new order* which would rest upon the free choice of peoples rather than upon the arbitrary authority of Hapsburgs or Hohenzollerns. More than that, great populations bound by sympathy and actual kin to Rumania were also linked against their will to the conglomerate Austro-Hungarian Monarchy or to other alien sovereignties, and it was part of the task of peace to make a new Rumania *as well as a new Slavic state* clustering about Serbia." [14]

That the events of history support the conception that the Serb-Croat-Slovene State was a new state is evidenced by the division of territories in the Balkans made at the Paris Peace Conference.

In addition to the Treaty of Versailles there were negotiated a number of treaties in 1919 and 1920 to which the Serb-Croat-Slovene State was a party as well as the United States. There was a treaty with Austria (Saint Germain-en-Laye, September 10, 1919); one with Hungary (Trianon, June 4, 1920); (the Serb-Croat-Slovene State); (Saint Germain-en-Laye, September 10, 1919); Bulgaria (Neuilly, November 27, 1919); Turkey (Sevres, August 10, 1920); (Lausanne, July 24, 1923) and there were others. By these treaties, as well as the Treaty of Versailles [15] the boundary lines of the Serb-Croat-Slovene State were defined. Territory was taken from Bulgaria, from Austria, from Hungary, and given not only to the Serb-Croat-Slovene State,

but territory was also given to Italy as well. In fact, the boundary disputes of the Balkans have been a source of trouble even to the present day.

The treaties with Austria, with Hungary, and with Bulgaria, had similar or identical provisions relating to the Serb-Croat-Slovene State which are exemplified by the language of the Treaty with Austria (Treaties, etc., Vol. 3, 67th Congress, fourth session, Senate Document No. 348, p. 3171.)

"Section II.—Serb-Croat-Slovene State.

"Article 46.

"Austria, in conformity with the action already taken by the Allied and Associated Powers, recognises the complete independence of the Serb-Croat-Slovene State.

"Article 47.

"Austria renounces, so far as she is concerned, in favour of the Serb-Croat-Slovene State all rights and title over the territories of the former Austro-Hungarian Monarchy situated outside the frontiers of Austria as laid down in Article 27, Part II (Frontiers of Austria) and recognised by the present Treaty, or by any Treaties concluded for the purpose of completing the present settlement, as forming part of the Serb-Croat-Slovene State."

Two treaties with Turkey were involved, one signed at Sevres August 10, 1920 (Senate Document No. 7, 67th Congress) which was reconsidered and reviewed by the Treaty of Lausanne of July 4, 1923, (Records of the Lausanne Conference, His Majesty's Stationery Office, London, 1923.).

Articles 23 and 24 thereof are significant in that they indicate that the Serb-Croat-Slovene State, as well as the Czecho-Slovak State were new states. Article 23 provided

14. "Messages and Papers of the Presidents," Vol. XVII, Page 8731.

15. It is not without significance that Article 434 of the Treaty of Versailles to which the Serb-Croat-Slovene State was a party, provides:

"Germany undertakes to recognise the full force of the Treaties of Peace and Additional Conventions which may be concluded by the Allied and Associated

Powers with the Powers who fought on the side of Germany and to recognise whatever dispositions may be made concerning the territories of the former Austro-Hungarian Monarchy, of the Kingdom of Bulgaria and of the Ottoman Empire, and to recognize the *new States* within their frontiers as there laid down." (Department of State Publication 2724, Conference Series 92. (Emphasis supplied.)

that Turkey recognize the new states as set forth in various treaties and also agreed to "recognize the new states within their frontiers as there laid down." And by Article 24 "recognizes the frontiers of Germany, Austria, Bulgaria, Greece, Hungary, the Serb-Croat-Slovene State and the Czecho-Slovak State as those frontiers have been or will be determined by the treaty referred to in Article 23 or by any supplementary conventions."

The territory which was thus put into the Serb-Croat-Slovene State in addition to Serbia was taken from Austria, from Hungary and the other countries mentioned by force of arms and as a condition of the terms of surrender and of peace with those countries. It was not a voluntary cession by Austria-Hungary or Bulgaria to Serbia such as occurred in Germany after the treaties of 1852 and 1868 considered in Terlinden v. Ames, supra.

None of these treaties, including the treaty with the Serbs-Croats-Slovenes, was ever submitted to the United States Senate for ratification. An extensive search by counsel, as well as by the author of this memorandum, has turned up little or no material wherein either the President or the State Department communicated to the Senate, or made any public statement concerning the failure to submit them except the general statement that they were all involved with the Treaty of Versailles and all comprehended the creation of the League of Nations.

European writers on the subject confirm the idea that the Serb-Croat-Slovene State was a *new state* as, for instance, Prof. Erich Kaufman, in the Niemeyers Zeitschrift fuer Internationales Recht, XXXI Chapter, pp. 211–251, observes "Der serbisch-kroatisch-slovenische Staat ein neuer Staat" (the Serb-Croat-Slovene State is a new State.)

A. N. Sack, "Les effets des transformations des Etats sur * * * leurs obligations, * * *" Paris, Sirey, 1927, I, p. 3. The Serb-Croat-Slovene State is shown as a new state.

Manlio Udina, "L 'estinzione dell' Impero Austro-Ungarico nel Diritto Internazionale", 2nd ed., pp. 288, 303, concludes that the Serb-Croat-Slovene State is a new state.

Paul Guggenheim, "Beitraege zur Voelkerrecht Lichen Lehre vom Staatenwechael (Staatenzukzession)" 1925, states "The latest practice of states known of one undoubted case of complete state discontinuity * * * where the old states disappeared and a new state arose, i.e., the disappearance of the Kingdom of Serbia (and Montenegro) which was followed by the new-established state of Yugoslavia. Serbia ceased to exist as a subject of international law. * * *"

Prof. Erich Kaufman, in a treatise appearing in Niemeyer's Review of International Law (Zeitschrift fuer Internationales Recht), Vol. 31, pp. 211–251, entitled "The Serb-Croat-Slovene State is a new State," on page 47 refers to a note of May 12, 1921 despatched by the Serb-Croat-Slovene State through its foreign office to the German Embassy wherein it was stated "Therefore this legal office (of Foreign Affairs) stresses that, since it was not with the old Kingdom of Serbia that peace was made, but with the new state of the Serb-Croat-Slovene * * *." Thus we have a declaration by the Serb-Croat-Slovene State that it was a new state and not merely a continuity of the Kingdom of Serbia.[16]

It is significant to note that in the Treaty with the Serb-Croat-Slovene State of September 10, 1919, which was never submitted to the Senate and was never ratified, and thus never came into effect, that Article 12 provides that pending the conclusion of

16. Some point is made that in June 1921 while Charles Evans Hughes was Secretary of State he addressed a communication to a private law firm in New York to the effect that it was the opinion of the Department that the previous treaties between Serbia applied to the territory acquired by the Serb-Croat-Slovene State from the Austrian-Hungarian Empire. While that opinion is entitled to most respectful consideration I do not think a private communication in a nonadversary proceeding is entitled to prevail over the reasons assigned for my conclusions in the within memorandum.

new treaties all the treaties between Serbia and any of the principal and allied powers would *ipso facto* be binding upon the Serb-Coat-Slovene State.

"Pending the conclusion of new treaties or conventions, all treaties, conventions, agreements and obligations between Serbia, on the one hand, and any of the Principal Allied and Associated Powers, on the other hand, which were in force on the 1st August, 1914, or which have since been entered into, shall *ipso facto* be binding upon the Serb-Croat-Slovene State."

If these treaties automatically became binding upon the Serb-Croat-Slovene State under the theory now advocated by the demanding government, it would have been entirely unnecessary to have put any such a provision in the treaty.

It is noted in that connection that although the Treaty of Versailles failed of confirmation, nevertheless a subsequent treaty was concluded with Germany wherein special provision was made for the continuance in force of more than twenty-six treaties specifying them, and the general provision made that the United States had the right to notify Germany of such bilateral treaties or conventions which it wished to revive with Germany, and that thereafter the United States concluded a new extradition treaty with Germany which was concluded in 1930 and ratified by the Senate in 1931. Similar provisions were included in the treaties with Austria and with Hungary. This is persuasive of the conclusion that it was generally regarded at that time that previous treaties were abrogated unless specifically affirmed or provision made for their affirmation in a treaty ratified by the Senate.

A similar situation existed with relation to Austria-Hungary and similar treaties were made.

Under the authority of and partially paraphrasing the language of Clark v. Allen, supra, all these things are convincing "evidence that the political departments of this government at the time of the collapse and surrender" of the Central Powers at the end of World War I in 1919 considered that the collapse and surrender and the repartitioning of Europe as "putting an end" to all the previous treaties of the countries involved in the war except those specifically designated by the various treaties which were negotiated although not ratified by the United States Government. That is true not only of the political departments of the United States Government but also all the other governments joining in the series of treaties arising out of the Paris Conference of 1919.

It is not without significance that the government of Yugoslavia first demanded that the United States surrender the petitioner herein as a "war criminal" under resolutions of the United Nations and did not demand petitioner until after the State Department sent a note to the Yugoslav Ambassador suggesting that the treaty of 1902 was in force.[17] This is not conclusive but it is persuasive that the present Yugoslav government did not regard the exchange of notes of December 1945 and April 1946 as binding it to that treaty.

■ For all of these reasons it is my conclusion that the Treaty between the United States and the Kingdom of Serbia of 1902 is not now in force and effect between the United States and the country now known as Yugoslavia.

In view of the fact that I find no treaty is in existence it is unnecessary to give consideration to whether or not the complaint on its face shows the alleged offenses to be "of a political character."

Subdivision 3 of Rule 45 of Rules of the Supreme Court 28. U.S.C.A. provides as follows:

"3. Pending review of a decision discharging a prisoner on habeas corpus, he shall be enlarged upon recognizance, with surety, for his appearance to answer and abide by the judgment in the appellate proceeding; and if in the opinion of the court or judge rendering the decision surety ought not to be required the personal recognizance of the prisoner shall suffice."

17. See Footnote No. 6.

At the time the bail was fixed, as indicated by my remarks from the bench set forth in full in Footnote No. 4, it then seemed to me that the bail of $50,000 was excessive. I adhere to that view now and see no reason to require this defendant to raise and place such an excessive bail, particularly in view of my holding concerning the nonexistence of a treaty and that there is grave doubt as to whether or not the indictment on its face shows the alleged offenses to be extraditable as not being "of a political character" even though that question is not now necessary of decision.

It is, therefore, ordered that the petitioner be released and his bail is set in the sum of $5,000.

The within memorandum will suffice as findings of fact and conclusions of law. The petitioner will prepare formal judgment.