## CORDOVA *v.* GRANT, EXECUTOR OF COTTON.

### ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

No. 104.   Submitted December 18, 1918.—Decided January 13, 1919.

Plaintiff claimed, under the laws of Texas, land lying between the present and former beds of the Rio Grande. Defendant, claiming under Mexican grants, set up that, as plaintiff's title depended on whether the international boundary had shifted with the river, and as our government, though claiming and exercising *de facto* juris-diction over the locus, conceded the true boundary to be unsettled, and by its treaties and acts with Mexico had agreed upon a commis-sion with exclusive jurisdiction to settle it, the courts were thereby deprived of jurisdiction, and the case should be dismissed or the trial stayed until the boundary should be established. Our government had rejected the action of a commission which sat under the last of the treaties referred to, and had waived objection, based on comity, to the litigation. *Held,* that the District Court had jurisdiction and might properly proceed with the case, and that its holding to that effect did not involve the validity or construction of a treaty. P. 419.

Writ of error dismissed.

THE case is stated in the opinion.

*Mr. Frank G. Morris* for plaintiff in error:

It is manifest from the whole course of the pleadings and the evidence and the requested charges refused, and the

exception to the peremptory charge for plaintiff, that the sole question of title at issue drew in question a construction of the boundary treaty of 1889 and the arbitration treaty of 1910, and the action of the arbitrators thereunder and the status of the matters involved in the treaty after the award of June 15th, 1911. It was conceded by the plaintiff in error in his pleadings in the court below that, but for the qualification and limitations as to the effect of the *de facto* jurisdiction exercised in the territory in question by the United States, the exercise of jurisdiction by this government to the Rio Grande, as it at present runs, would express an unqualified determination and decision by the political department of the government that the international boundary followed the present channel of the river, which decision would in that case be binding on the courts.

But it was contended by plaintiff in error that the treaties mentioned gave character to the jurisdiction exercised by the United States, in that the two governments in said conventions treated the international boundary as an open question, to be thereafter determined amicably between them. They said substantially to each other that neither would undertake to decide for itself the true location of the boundary, and that the United States, in virtue of the treaty provisions, might police the territory in question pending a decision by the respective governments. These treaties, therefore, so qualified the jurisdiction exercised by the United States that it did not express a decision by this government that the channel of the present river, or any location south or west of the channel of the Rio Grande of 1852, constituted the true boundary. Hence the contentions arose on the treaty:

1. That as the treaties withdrew from the courts of the respective nations the power to decide the boundary question in cases wherein the title to lands would neces-

sarily depend upon the location of the international boundary, the courts could not decide the titles to lands depending on the boundary until the respective governments should decide the location of the boundary.

2. That if the courts of the United States might, for the purpose of trying titles to land in the territory in question, undertake to decide whether the Rio Grande had receded from its position in 1852 by gradual and slow erosion of the Mexican banks of the river and deposit of alluvium on the American side, the court could not, as it might have done in the absence of the treaty provisions mentioned, presume, from the exercise of *de facto* jurisdiction by this government up to the present channel of the river, that the political department of this government had decided that the change was such as to make the land on the north or east of the river American soil and therefore accretions to the plaintiff's abutting lands. The courts in the United States take notice of treaties and adjudicate rights accruing under them. If the court might try the case it should therefore try it as an ordinary boundary suit between individuals which would require the plaintiff to prove that he had acquired land by accretion. The treaties precluded him from relying on presumptions arising from actions of the political department of the government which were so qualified by the treaties as not to afford the presumption on which plaintiff below relied.

Furthermore, the defendant below relied upon the decision of the Arbitration Commission that the international boundary was the channel of the river of 1864, which was further south and west than the channel of 1852 but not so far south or west as the present channel of the Rio Grande. This contention necessarily involved a construction of the treaty of 1910 as to the powers of the commission and as to the effect of their award under the treaty. And this contention is not dispelled by re-

ferring to the acts of the executive department in refusing
to enforce the award. It was not void on its face, and may
be made certain by a survey. If so, the executive alone
could not nullify the decision or take its effect from the
courts when the award comes in question where private
rights are involved. *Foster & Elam* v. *Neilson*, 2 Pet. 253.

The cases of *Warder* v. *Loomis*, 197 U. S. 619, and
*Warder* v. *Cotton*, 207 U. S. 582, are memorandum de-
cisions which give no statement as to what questions were
properly raised in them.

Under § 238 of the Judicial Code there are no rules of
pleading or requirement that the federal question be
specially set up or pleaded as was required under some of
the statutes. Whether a construction of a treaty is by
appropriate procedure drawn in question in a trial at
law in a district court of the United States or not, must
depend on the application to the case of the state procedure
and practice in which the court is located.

*Mr. Walter B. Grant* and *Mr. T. J. Beall* for defendant
in error:

Although the answer of defendant and request for in-
struction in effect refer to the treaty of 1910, and to the
action of the boundary commissioners thereunder, the
facts show that no question as to its validity or construc-
tion is raised. The question being a political one, the
case is not reviewable under clause 4 of § 238, Jud. Code.
Mere allegations not based upon facts, showing wherein
the construction and validity of the treaty are drawn in
question, do not create a case under that clause. *Budzisz*
v. *Illinois Steel Co.*, 170 U. S. 41.

Neither the trial court nor this court has jurisdiction
to determine whether the changes in the river left the
land territory of the United States or of Mexico. It was
admitted that the United States and Texas have, since
the land was formed, exercised government control and

political jurisdiction.  It was also shown that the State Department, through an officer appointed for the purpose with the assent of Mexico, had determined that defendant had failed to exhibit such *prima facie* Mexican title as was contemplated by the agreement for protection of the *status quo*, and that there was no occasion to interfere with the action.  The boundary question is purely a political one.

*Warder* v. *Loomis*, 197 U. S. 619, and *Warder* v. *Cotton*, 207 U. S. 582, involved the identical question concerning the land involved in this suit, or land adjacent thereto.

A question of international boundary is for the political departments, and their action binds the courts, leaving no constitutional or treaty question open for judicial determination.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an action of trespass to try title to land in Texas lying between the present and former bed of the Rio Grande.  The plaintiff (the present defendant in error) alleged that his testator and those under whom the latter claimed had held the land under color of title from the State of Texas for the several statutory periods of limitation, and that the defendant unlawfully entered when the plaintiff had the legal title in possession as devisee. The jurisdiction of the District Court was based upon diversity of citizenship.  The defendant pleaded that the plaintiff's title depended upon whether the land was within the United States, and that that depended upon whether the Rio Grande, established as the boundary in 1852, had changed its channel in such a way as to continue to be the boundary or not—the land in question having been upon the Mexican side of the river in 1852 and now being on the side of the United States.  The defendant

went on to allege that while the United States now exercises a *de facto* jurisdiction over the territory where the land lies, it does so with the admission by treaty and diplomatic correspondence that the boundary is unsettled, and that "the treaties and acts of the respective governments placing said boundary disputes within the jurisdiction of certain special authorities, of which this court must take judicial notice, must necessarily have deprived the courts of each of said republics of jurisdiction," &c. On this ground it was prayed that the Court either dismiss the case or stay the trial until the boundary should be established. Subject to this the defendant pleaded not guilty and the ten years statute of limitation of Texas. The plaintiff demurred to the plea to the jurisdiction as showing on its face that the United States and Texas were exercising *de facto* jurisdiction over the land; set up that it was agreed between the United States and Mexico that Mr. Wilbur Keblinger should decide what lands in the disputed territory were proper subjects of litigation in the Courts of the United States and of Texas, that he had decided this land to be such, and that his finding had been acquiesced in by both governments. He further alleged that the Government of the United States always had claimed and now claims the land as belonging to the United States, and he denied all the defendant's allegations of fact.

It was agreed that the patents from the State of Texas under which the plaintiff claimed bounded the grants on the Rio Grande, and that if the additions now in controversy had been made by accretion, they belonged to the plaintiff. It also was admitted, and agreed that the Court in deciding upon the demurrer might notice, that the United States, the State of Texas and the County and City of El Paso were then and for many years before exercising government control and political jurisdiction over the property in question and that the United States and

State had enforced their laws over the whole of the same. It was agreed further that the Court might take notice of the correspondence between the Secretary of State, the Mexican Ambassador and Keblinger, the opinion of the Boundary Commission, and the action of the United States thereon. It appeared from the documents that the United States, while admitting that the boundary line was in question between the two countries, never had admitted any derogation of its *de facto* jurisdiction over the tract; that it had suggested to the federal courts that as a matter of comity they should not put into execution writs of ejectment, &c., against persons alleging Mexican titles, but that it found it necessary to limit this comity so as to exclude from it persons who had no *prima facie* Mexican titles in order to stop occupation by squatters who were taking advantage of the Government's forbearance. Keblinger was appointed to determine what persons showed a *prima facie* title. He decided against the defendant and with the sanction of the Government informed the plaintiff that the Government would not object if he should proceed.

The District Court sustained the demurrer to the plea to the jurisdiction and the only color of right to bring the case to this Court by direct appeal consists in a suggestion that the construction of a treaty is involved.

The decision of a Court that it has jurisdiction on the ground taken by the demurrer simply means that the Court finds the Government in fact asserting its authority over the territory and will follow its lead. It does not matter to such a decision that the Government recognizes that a foreign power is disputing its right and that it is making efforts to settle the dispute. The reference to Keblinger and his finding are important only as showing that there is no present requirement of comity to refrain from exercising the jurisdiction which in any event the Courts possess. Jurisdiction is power and matter of fact.

The United States has that power and the Courts may exercise their portion of it unless prohibited in some constitutional way.

If the passage quoted from the answer is sufficient to open the contention that treaties had contracted for the establishment of a boundary commission with exclusive jurisdiction and so had prohibited the Courts from dealing with the question, neither the validity nor the construction of any treaty was drawn in question; or if an attenuated question can be discovered it is no more than formal. A commission sat under the last of the treaties and its action was rejected by the Government as abortive. As the Government had withdrawn its suggestion of comity so far as the present case is concerned, there was no reason why the Court should not proceed to trial, and there is no reason why the present writ should not be dismissed as it was in *Warder* v. *Loomis*, 197 U. S. 619, and in *Warder* v. *Cotton*, 207 U. S. 582. It follows that some other questions argued cannot be discussed.

*Writ of error dismissed.*