**IVANCEVIC, Consul General of Yugoslavia,**

v.

**ARTUKOVIC.**

**WARE, United States Marshal**

v.

**ARTUKOVIC.**

**No. 13552.**

United States Court of Appeals,
Ninth Circuit.

Feb. 19, 1954.

Ronald Walker, Los Angeles, Cal., for appellant.

Robert T. Reynolds, Washington, D. C., Vincent G. Arnerick, Edward J. O'Connor, Los Angeles, Cal., for appellee.

Laughlin E. Waters, U. S. Atty., Clyde C. Downing, Arline Martin, Asst. U. S. Attys., Los Angeles, Cal., for appellee Robert W. Ware, U. S. Marshal.

Before STEPHENS, HEALY, and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

Rafo Ivancevic, Consul General of the Federal Peoples' Republic of Yugoslavia, hereinafter sometimes abbreviated to "Yugoslavia", has filed with the United States Commissioner at Los Angeles, California, a formal request upon behalf of his country that an order issue for the extradition of Andrija Artukovic, alias Alros Anich, to Yugoslavia, in which country a warrant is outstanding for his arrest as a fugitive charged with the crime of murder.[1] The Commissioner ordered Artukovic held by the United States Marshal without bond pending a hearing in the extradition proceedings,[2] and Artukovic thereupon petitioned the United States District Court for the issuance of the writ of Habeas Corpus, praying that the court order his release

---

1. Title 18 U.S.C.A. § 3184; Article II of the Treaty of Extradition between the United States of America and Serbia, proclaimed May 17, 1902, 32 Stat. 1890.

2. Title 18 U.S.C.A. § 3141 authorizes only a judge or justice to issue bail in a capital case.

upon the posting of a bond in a reasonable sum.

Subsequently, Artukovic was permitted to amend his petition in order to attack the jurisdiction of the proceedings on two grounds: i. e., that the charge against him was of a political nature and therefore was not an extraditable offense,[3] and, more sweeping in effect, that no treaty of extradition exists between the United States and Yugoslavia. Bail was issued in the amount of $50,000 pending a determination of the jurisdictional question. After a hearing, the court rendered a decision which did not reach the first reason mentioned, but nevertheless ordered Artukovic's release upon the ground last named, subject to a $5,000 bond pending appeal. Artukovic v. Boyle, D.C.S.D.Cal., 107 F.Supp. 11. The United States has filed its brief as amicus curiae requesting reversal of the district court judgment. We quote in the margin the statement in the Government's brief at page 4, as to the "Interest of the United States".[4]

■ We start with the admitted fact that extradition from the United States to a foreign country may be accomplished "only during the existence of any treaty of extradition with such foreign government." Title 18 U.S.C.A. § 3181. See, also, Factor v. Laubenheimer, 1933, 290 U.S. 276, 287, 54 S.Ct. 191, 78 L.Ed. 315.

All parties agree that the "Kingdom of the Serbs, Croats and Slovenes" changed its governmental structure somewhat and its official title to "Kingdom of Yugoslavia" in 1928, and thereafter to the "Federal Peoples' Republic of Yugoslavia" in 1945, and that these changes were internal and political changes and did not affect the validity of any treaty which was effective under the government of *"Kingdom of the Serbs, Croats and Slovenes"*.[5] Therefore, if the treaty between the United States and Serbia

---

3. Crimes of a political nature are specifically excluded as subjects for extradition under Article VI of the Treaty of Extradition between the United States of America and Serbia.

4. "Interest of the United States. The proceedings in this case involve the effect of a change in government or a change in the geographical limits, or both, of one party thereto upon the treaty relations of the United States with other governments and not alone its treaty relations with Yugoslavia. The Executive Branch of the Government has proceeded heretofore on the theory that, in the absence of the complete absorption of one of the high contracting parties to the treaty by a third country, a mere change in the form of government or the expansion or contraction of the geographical boundries of that high contracting party did not affect the termination of the treaty relations with that party. Consequently, unless the changed conditions were such as to suggest the desirability of new treaties, the prior treaties have been considered as remaining in full force and effect. This practice has been in conformity with the generally accepted principles of international practice and is believed to be sound. A departure from the established practice after this late date could cause great confusion since there is probably no country now existing with which

the United States has concluded treaties that has not undergone some change, either with respect to the form of its government or with respect to its boundaries. Heretofore the Department of State has been looked to for a determination of the question whether a specific treaty is still in effect after such changes in government or boundaries. The decision of the District Court, if not reversed, will preclude such a determination.

"As the decision, if not reversed, will affect the entire treaty structure, it is believed that the Government's interest in the case transcends in importance the interest of the parties to these proceedings whose sole interest is the matter of the possible extradition of the appellee. The Executive Branch of the Government is not presently concerned with this phase of the case and will not be concerned with it unless and until it shall have been certified to the Department of State by the extradition magistrate pursuant to the provisions of [Title] 18 U.S.C. § 3184."

5. The Rights of War and Peace, Hugo Grotius, 1625, Translation from the Latin by Rev. A. L. Campbell, 1814, Vol. I, pages 336, 338, and Vol. II, Book II, Ch. XVI, speaking on "The Interpretation of Treaties", Grotius said: " * * * although a republic be changed into a regal government, a treaty will remain in force;

survived as an effective treaty between the United States and the Kingdom of the Serbs, Croats and Slovenes, it survived as an effective treaty between the United States and the Federal Peoples' Republic of Yugoslavia, and is effective in the extradition proceedings pending before the United States Commissioner.

After an exhaustive hearing and consideration of authorities and official documents, the district court found that there was no treaty of extradition in existence between the demanding nation and the United States, and that there never has been. It was freely admitted by all parties that such a treaty had existed between the United States and Serbia dated May 17, 1902, but Artukovic claims that when, in 1918, several principalities or nations, inclusive of the Kingdom of Serbia and the Kingdom of Montenegro, combined under the name of the "Kingdom of the Serbs, Croats and Slovenes", a new nation was born which had no carry-over political relations to any of the old governments; and that, therefore, the United States-Serbian Extradition Treaty of 1902 which the demanding government and the United States Marshal claim is in effect between the United States and Yugoslavia, has no validity. On the other hand, the United States Marshal and Consul General of Yugoslavia, as well as the United States by its Amicus Curiae brief, assert that the sovereignty of Serbia, as that country existed upon the date of the United States-Serbian Extradition Treaty of 1902, has continued to exist uninterruptedly and that the combination of countries under the name of "Kingdom of the Serbs, Croats, and Slovenes" was not and is not an entirely new nation but the same country under the change of official title, and is a continuation of the Serbia of 1902 as a Greater Serbia.

The historic events which lead to the different views we have just set out are not in issue. Whether these events support one or the other of such views is the issue. Since these events are proved by agreement as to fact and by official and authoritative documents, we are in as favorable a position to decide the issue as was the district court.

The sovereign nation of the Federal Peoples' Republic of Yugoslavia is the combination of the independent sovereign states of the Kingdom of Serbia and of Montenegro and the Serbian, Croatian and Slovene provinces formerly under the government of the Empire of Austria-Hungary. We have reproduced the portion of appellant's (Ivancevic's) opening brief which names and gives a limited political and ethnic reference to each.[6] We have concluded that the factual statements therein are accurate in-

---

for the political body continues the same, although the head be changed, and the sovereign power, which before was diffused among many members, is now centered in one."

See, also: International Law, Chiefly as Interpreted and Applied by the United States, Charles C. Hyde, 1945, page 1528; Digest of International Law, Hackworth, 1940, Vol. V, § 511; Research in International Law, Harvard Law School, 1935, Draft Convention on the Law of Treaties, Article 24; A Digest of International Law, John Bassett Moore, 1906, § 78.

6. Appellants' Opening Brief at page 18: "Serbia (or Servia, which was then the common spelling) was in 1901 an independent, sovereign state. One of several contiguous areas populated by Yugo, or South, Slavs (Serbs, Croats, Slovenes, Macedonians, Montenegrins are South /or Yugo/Slav nations), Serbia's absolute independence was recognized by the Treaty of Berlin in 1878 after centuries of Turkish rule and dependence. As a result of the Balkan Wars of 1912–13, Macedonia was also liberated from the Turks, and the larger part of that area was annexed to Serbia. In 1901, the only other Yugoslav people to have achieved independence were the Montenegrins, who had in fact maintained their independence through the centuries notwithstanding the efforts of the Turks to conquer them. However, Montenegro's independence was not actually recognized until the Treaty of Berlin in 1878. All other Yugoslav regions continued under foreign rule until 1918, as follows:

"(1) Bosnia and Herzegovina were a Turkish province until 1908, although pursuant to the Treaty of Berlin, they had become an Austrian mandate in 1878 and were occupied and governed by that

sofar as they touch the issues of this case.

The first title assumed by the combination of countries was the "Kingdom of the Serbs, Croats and Slovenes", which was subsequently changed by internal politics to the "Kingdom of Yugoslavia", and later to the "Federal Peoples' Republic of Yugoslavia". The people of each of these combining countries are preponderantly of Yugoslavic or South Slavic blood and throughout a very, very long period of time they have been keenly conscious of their interrelation and have harbored an unabated ambition to live as a part of a United Yugoslav state. The upheaval in Europe, owing to the First World War, shook several Slav provinces from the old Monarchy of Austria-Hungary and, some time before, other Slav-peopled portions of Turkey had been separated from that country. The opportunity for unity of the South Slavs was embraced and finally accomplished. Serbia, an area of Central Europe peopled by Slavs in the great majority, achieved complete independence in 1878 and was an important going state before and during World War I, with international recognition and official representation in the capitals of the world. Montenegro was a small though independent nation. The other units in the combination, though not full fledged nations, were at the time of the combination free from domination by neighbor countries.

We recite here certain historic facts which, we think, are critical to the issue.

On December 7, 1914, Serbia promulgated a statement in which it characterized its part in World War I as,

"* * * a struggle for the liberation and unification of all our unliberated brethren, Serbs, Croats and Slovenes * * *." [7]

On May 6, 1915, The Yugoslav Committee in London, composed of Yugoslav refugees, announced that,

"* * * the struggle of Serbia and Montenegro is not a struggle of conquest to expand their borders; these two Serbian states are protagonists in the liberation of all Yugoslavs and their task is the task of all of us." [8]

On July 20, 1917, a Committee of Yugoslavs and representatives of the Serbian government announced from the Island of Corfu affirmation of their principles as,

"* * * the only and inalienable demand of our people * * * the basis of the principle of free self-determination of peoples, to be lib-

country. In 1908, Bosnia and Herzegovina were annexed by the Austro-Hungarian Monarchy, of which they became an integral part with limited autonomy in local matters. Klobuk, the village in which the Appellee was born in 1900 is in Herzegovina, not Croatia as the District Court [R. 49] states.

"(2) Croatia and Slavonia, long under Hungarian domination, were reunited with Hungary under the so-called "Compromise" in 1868, after twenty years of separation, resulting from the Hungarian revolt against Austria in 1848. Integral parts of the Austro-Hungarian Monarchy, they were permitted only limited autonomy in local matters.

"(3) Dalmatia and Carniola, and Carinthia, Styria and Istria (we are concerned only with parts of the latter three) were Austrian provinces and integral parts of the Austro-Hungarian Monarchy enjoining various degrees of restricted autonomy in local matters.

"(4) Vojvodina (Banat, Backa and Baranja), Medjumurje and Prekomurje were incorporated into Hungary and as such were integral parts of the Austro-Hungarian Monarchy.

"The unification of the Yugoslavs was effected in 1918 (upon the distintegration of the Austro-Hungarian Monarchy resulting from World War I) by the voluntary *union with Serbia* of Montenegro and the regions of the former Austro-Hungarian Monarchy referred to above. The unified state of the Yugoslavs was first called the Kingdom of the Serbs, Croats and Slovenes, later the Kingdom of Yugoslavia, and since World War II, the Federal People's Republic of Yugoslavia."

7. F. Sisic, Documents on the Creation of the Kingdom of the Serbs, Croats and Slovenes (Zagreb, 1920) p. 10.

8. Ibid, p. 25.

erated from all foreign enslavement and united in one free, national and independent state." [9]

A few days later, the "Montenegrin Committee for National Unification" announced its acceptance of the Corfu Declaration.

On October 6, 1918, the "National Council of Slovenes, Croats and Serbs" was organized as

" * * * the political body representing all Slovenes, Croats and Serbs * * * ".[10]

Shortly afterward, Serbia recognized the National Council as the lawful government of the Serbs, Croats and Slovenes, and on November 24, 1918, the National Council resolved to

" * * * proclaim the unification of the State of the Slovenes, Croats and Serbs * * * with the Kingdom of Serbia and Montenegro into a unified State of Serbs, Croats and Slovenes * * *," [11]

and Montenegro agreed a few days later. Many events of importance to the issue occurred between the dates we have specified, all of them trending toward the same end. The culmination seems well illustrated by the exchange of official communications from the Serbian government to the United States Secretary of State and the Secretary's reply thereto.[12]

In 1921, United States Secretary of State Hughes, in answer to a United States citizen, wrote:

9. Ibid, p. 100.

10. Ibid, p. 174.

11. Ibid, pp. 255, 256.

12. "Foreign Relations of the United States, 1919, Vol. II, Publication No. 661, Department of State, Government Printing Office, 1934:

"Yugoslavia

"Recognition by the United States of the Kingdom of the Serbs, Croats and Slovenes, February 7, 1919

"860h.01/23

"The Serbian Chargé (Simitch) to the Secretary of State

No. 176 Washington, November 11, 1918

"Your Excellency: I have the honor to inform Your Excellency that the Serbian Government has recognized the National Council in Zagreb as the legitimate representative of the Serbians, Croatians, and Slovenes who are *residing within the boundaries of the former Austro-Hungarian Monarchy* until the *definite organization of one state* which will comprise all Serbians, Croatians and Slovenes, when the Serbian Government and the National Council will create one common government who will protect the rights of *the nation of all Serbians, Croatians and Slovenes.*

"Until the organization of this Government Mr. Troumbitch, President of the Jugoslav Committee in London, has been entrusted with the mandate to represent the National Council in Zagreb with the Allied Governments.

"In bringing the above to the knowledge of Your Excellency I beg to present that the Serbian Government anticipates that

the United States Government will recognize the National Council in Zagreb, the members of whom have been elected by the parliament, as the legitimate government of the Jugoslavs (Serbians, Croatians and Slovenes,) *living within the boundaries of the former Austro-Hungarian Monarchy,* and consider that government and its army as an ally.

"With renewed assurance [etc.]

"Y. Simitch."

860h.01/21

"The Serbian Chargé (Simitch) to the Acting Secretary of State

[Translation]

"Washington, undated.

[Received January 6, 1919]

"Mr. Secretary: I am instructed by my Government to submit herewith the following communication:

"In accordance with the decision of the Central Committee of the National Council of Zagreb which represents the *State of all the Serbian Croatian and Slovene provinces within the boundaries of the former Austro-Hungarian Monarchy,* a special Delegation has arrived at Belgrade on the 1st of December. This Delegation by one [a] solemn address, presented to His Highness the Crown Prince, has proclaimed the Union of all the Serbian Croatian and Slovene provinces of the former Dualist Monarchy *into one single State with the Kingdom of Serbia* under the Dynasty of His Majesty King Peter and under the regency of the Crown Prince Alexander. In the reply to this address, His Royal Highness the Crown Prince has proclaimed the Union of Serbia with the above mentioned independent State of Slovenes, Croats and Serbs into

" * * * No formal understanding has been reached with the Government of the Kingdom of the Serbs, Croats and Slovenes as to the application of these agreements to the territory of that country which formerly belonged to the Austro-Hungarian Empire. It is the opinion of the Department that the treaties may properly be regarded as applicable to that territory." [13]

The trial court discounts the weight of this opinion because it was given in the form of private communication in a non-adversary proceeding. Yet it must be pointed out that the communication in question was not private communication, but an official one of the Secretary of

one single Kingdom: 'Kingdom of the Serbs, Croats and Slovenes.' His Highness has accepted the regency and will form a common Government. On the 17th of December His Royal Highness the Crown Prince received in audience a delegation from Montenegro. This Delegation has submitted to His Highness on the 26th of November the decisions of the Great National Assembly of the Kingdom of Montenegro. By virtue of these decisions His Majesty King Nikolas I, and His dynasty have been declared destitute of all the rights upon [to] the throne of Montenegro and the Kingdom of Montenegro, united to Serbia under the dynasty of Karageorgevitch, is included in the Kingdom of the Serbs, Croats and Slovenes. His Royal Highness the Crown Prince has declared that He accepts with pleasure and thanks these decisions. A common Government for the new Kingdom has been organized on the 21st of December. The Legations, Consulates and other Missions of the Kingdom of Serbia will be the Legations, Consulates and other Missions of the Kingdom of the Serbs, Croats and Slovenes.

"Bringing the above to the knowledge of the United States Government, the Serbian Government is strongly convinced that their communication will be met sympathetically:—The Union of all the nations of the Serbs, Croats and Slovenes in one single state, which results from the imprescriptible right of the people to dispose of their destiny.

"I take [etc.]

"Y. Simitch."

860h.01/21

"The Acting Secretary of State to the Yugoslav Minister (Grovitch)

No. 2 Washington, February 10, 1919.

"Sir: I have the honor to acknowledge the receipt of an undated Note from the Serbian Chargé d'Affaires stating that in accordance with a decision of the Central Committee of the National Council of Zagreb, representing the *State of all the Serbian, Croatian and Slovene provinces within the boundaries of the former Austro-Hungarian Monarchy,* the Serbian Crown Prince has proclaimed the union of all the Serbian, Croatian and Slovene provinces of the former Dualist Monarchy with the *Kingdom of Serbia* in a single state all under the title of 'Kingdom of the Serbs, Croats and Slovenes' under the rule of His Majesty King Peter and the regency of the Crown Prince Alexander.

"The Department further notes the statement contained in the Note that in accordance with the decision of a body proclaiming itself the Great National Assembly of the Kingdom of Montenegro, His Majesty King Nikolas I, and His dynasty, had been deposed from the throne of that country and had decreed the union of Montenegro with the Kingdom of the Serbs, Croats and Slovenes, and that this decision had been accepted by His Royal Highness the Crown Prince of Serbia.

"The Department further notes the statement that the Legation of Serbia in the United States will, hereafter, be known as the Legation of the Kingdom of the Serbs, Croatians and Slovenes.

"In reply I have the honor to inform you that the Government of the United States welcomes the union of the Serbian, Croatian and Slovene provinces within the boundaries of the former Austro-Hungarian Monarchy to Serbia and recognizes the Serbian Legation as the Legation of the Kingdom of the Serbs, Croatians and Slovenes.

"In taking this action, however, the United States Government recognizes that the final settlement of territorial frontiers must be left to the Peace Conference for determination according to the desires of the peoples concerned.

"Accept [etc.]

"Frank L. Polk."

[Emphasis supplied.]

See, also, Artukovic v. Boyle, D.C.S.D. Cal.1952, 107 F.Supp. 11, 25, footnote 10.

13. Secretary Hughes to Defrees, Buckingham and Eaton, June 4, 1921, MS. Department of State, file 711.60H/1; Digest of International Law, Hackworth, Vol. V, p. 375.

State, as such, with respect to a matter peculiarly within his official charge. And but a short time thereafter, Secretary of State Hughes received a communication from the Yugoslav Chargé d'Affaires on September 29, 1921, as follows:

" * * * The Government of the Kingdom of the Serbs, Croats and Slovenes considers the treaties and conventions concluded between the Kingdom of Serbia and the United States as applicable to the whole territory of the Kingdom of the Serbs, Croats and Slovenes as constituted at the present." [14]

Thereafter, the Department, in reply to inquiries, stated that the treaties with Serbia were in force and applicable to the new Kingdom, including territory not part of Serbia before the World War of 1914–18.[15]

Hyde, in his International Law, Chiefly as Interpreted and Applied by the United States, Vol. 2, page 1535, says:

"It was logical and natural that the Government of the Kingdom of the Serbs, Croats and Slovenes, should have acknowledged to that of the United States in 1921, that it considered the treaties and conventions concluded between the Kingdom of Serbia and the United States as applicable to the whole territory of the Kingdom of the Serbs, Croats and Slovenes, as then constituted. The latter Kingdom embodied, in a territorial sense, the enlargement of the former Kingdom, and was the same State with a bigger body. It was also reasonable to contend, as did the United States in substance in 1921, that that Kingdom should regard those agreements as applicable to its territory which had formerly belonged to the Austro-Hungarian Empire. * * *."

Hackworth in "Digest of International Law", Vol. V, page 375, makes the following statement:

"It is conceded that the present Kingdom of Yugoslavia has replaced and absorbed the Kingdom of Serbia, and that the convention above referred to [Convention of Commerce and Navigation of October 14, 1881, 2 Treaties, etc. (Malloy, 1910) 1613] is now in full force and effect between Yugoslavia and the United States", citing Lukich v. Department of Labor and Industries, 1934, 176 Wash. 221, 223, 29 P.2d 388, 389; Urbus v. State Compensation Com'r, 1933, 113 W.Va. 563, 169 S.E. 164.

That Serbia was the nucleus around and to which the other countries would and did adhere in a united nation is further supported by the proclamation of Prince Regent Alexander of Yugoslavia, Christmas 1919, in which he felicitated the people of his country upon the culmination of Slav unity in government. We quote from the proclamation in the margin.[16]

---

14. The Chargé d'Affaires ad interim of the Kingdom of the Serbs, Croats, and Slovenes to Secretary Hughes, September 29, 1921, MS. Department of State, file 711.60H/3; Digest of International Law, Hackworth, Vol. V, pp. 374–5.

15. The Under Secretary of State (Phillips) to Mr. Unkovich, November 5, 1923, MS. Department of State, file 711.60H/5; the Assistant Secretary of State (Castle) to Messrs. Nelson and McFall, September 28, 1927, MS. Department of State, file 711.60H/7; Digest of International Law, Hackworth, Vol. V, page 375.

16. Christmas Day Proclamation of Prince Regent Alexander of Yugoslavia (acting for his father, the King):

"To My People:

" * * * Finally is fulfilled the vow which through centuries and continuously all the generations of our race have confirmed and sanctified by their blood. * * *

"Exercising the Royal Power in His name [King Peter I], I have formed, in agreement with the leaders and representatives of all the National parties, Serb, Croat and Slovene, Our first State Government. As a visible sign of our fraternity and complete fraternal solidarity there are working in full accord in this Government the notables of the Nation of all three religions and of all the three names, the representatives of all the

The uncontrovertible fact before us is that a national union of the South Slav peoples was effected with Serbia as the nucleus. Serbia took an active part in the transitions which we have sketched; the King of Serbia continued as King of the union; Belgrade remained as the capital; the rights guaranteed by the Serbian Constitution were proclaimed as the rights of every person within the union; the foreign legations and war missions of the Kingdom of Serbia were authorized to act for the union. Both the United States and Yugoslavia acted and have continued to act in accord with the theory that the entity as it existed after the union was the political successor of the original Serbia with international political compacts continuing.

It does not appear that either the United States or Yugoslavia has ever before requested extradition from the other country, and this might be considered significant. However, in view of what we have already said, we think all possible significance on that score has disappeared. There is another reason, however, why it certainly is of no moment.

In 1882, the United States and Serbia negotiated a Treaty of Commerce and Navigation, 22 Stat. 963,[17] and also a Consular Treaty, 22 Stat. 968.[18] Those treaties have continuously been adhered to and recognized by both governments. The reasons for their continuing validity apply equally to the Treaty of Extradition.

Difference of opinion exists as to whether the combined country was *new*, or a continuance of Serbia.[19]

But, as we have already stated, we are of the opinion that the combination of

---

parties and of all the portions of our Kingdom.

"My Government will work in full accord with the Representatives of the Nation and will be responsible to them. For this purpose its duty will be to call together as soon as possible at Belgrade the National Representatives who include *delegates of the Serbian Skupschtina*, of Old Serbia, of Macedonia, of a proportional number of members of the National Councils and of representatives of the Voivodina and of Montenegro. This National Representation will form a provisional but complete representation of the Legislative Branch in our Kingdom.
" * * *
"It will be the duty of My Government to extend immediately to the whole territory of the Kingdom of the Serbs, Croats and Slovenes all the rights and liberties now enjoyed by the Serbs in accordance with the *Serbian Constitution.* [Emphasis ours.] In this manner the complete equality of all citizens before the law will be recognized and confirmed, all class privileges will be abolished and the liberty and equality of religious rights will also be guaranteed." Foreign Relations of the United States, 1919, Vol. II, page 896.

17. Treaties, Conventions, International Acts, Protocols, and Agreements between the United States of America and other Powers, as compiled by William M. Malloy, Vol. 2, page 1613.

18. Ibid, page 1618.

19. Authority for the contention that the Kingdom of the Serbs, Croats and Slovenes, i. e., Yugoslavia, is a "new state lacking continuity with Serbia" which is considered an extinguished state, follow: Guggenheim, Beitraege zur Voelkerrecht Liechen Lehre vom Staatenwechsel, 1925; Kaufman, Niemeyers Zeitschrift fuer Internationales Recht, in Chap. XXXI, pp. 211–251; Udina, L'estinizione dell' Impero Anstro-Ungarico nel Diritto Internationale, 2d ed., pp. 288, 303. See, also, the lectures of Peritch on "Droit International Yougoslave" given at the Hague Academy of International Law in 1928 (28 Recucil des Cours, p. 390ff).

Authority for the contention that Yugoslavia is a continuation of Serbia follows: Hyde International Law, Vol. 2, p. 1535; M. Yovanovitch, LeDroit Constitutionnel du Royaume des Serbes, Croates et Slovenes (1924) p. 12ff; Research in International Law, Harvard Law School, 1935, 1058–9; Hackworth, International Law, Vol. V, p. 375.

See, also: Lukich v. Department of Labor and Industries, 1934, 176 Wash. 221, 223; 29 P.2d 388, 389; Urbus v. State Compensation Com'r, 1933, 113 W.Va. 563, 169 S.E. 164.

McNair, in his "The Law of Treaties", 1938, at page 443, said as to the Serbs, Croats, and Slovenes state:

"There seems to be no doubt that this case must be regarded as enlargement of the territory of an existing state."

The United States, in its Amicus Curiae

countries into the Kingdom of the Serbs, Croats and Slovenes, and then by internal political action into "Federal Peoples' Republic of Yugoslavia" was formed by a movement of the Slav people to govern themselves in one sovereign nation, with Serbia as the central or nucleus nation. Great changes in the going government were in the planning, and were brought about, but the combination was not an entirely new sovereignty without parentage. But even if it is appropriate to designate the combination as a *new* country, the fact that it started to function under the Serbian constitution as the home government and under Serbian legations and consular service in foreign countries, and has continued to act under Serbian treaties of Commerce and Navigation and the Consular treaty, is conclusive proof that if the combination constituted a new country it was the successor of Serbia in its international rights and obligations.[20]

We hold that the district court was in error in holding that the treaty of extradition entered into by and between the United States and Serbia in 1902 does not constitute a valid and subsisting treaty between the United States and the Federal Peoples' Republic of Yugoslavia.

We place our decision upon our conclusion that the facts, independent of their political implications, do not support the decision of the district court. Nevertheless, we are not without realization of the high importance of such implications. From every practical and logical standpoint every nation must speak to every other nation through its Chief of State.[21] Here, the President, as the Chief of State, in recognizing the continuing validity of treaties between the United States and Serbia has acted upon a reasonable basis of fact peculiarly within his sphere of authority.[22]

There is no exact formula by which it can be determined that a change of a nation's fortunes amounts to a continuance of the old or the beginning of a new nation, and there can be no better

---

brief filed in the instant appeal, succinctly sums the facts as follows, at page 16:

"At the time of union of the other Serb, Croat, and Slovene provinces with Serbia in 1918, Serbia constituted more than one-third of the total area of the newly enlarged State and approximately one-third of the total population, far exceeding any other single State in the group. The other States turned to Serbia for their rulers, for their seat of government, for their constitutional guarantees. Belgrade, the capital of Serbia, remained the capital of the newly enlarged State. Serbian diplomatic representatives in other capitals of the world became the diplomatic representatives of the Serb-Croat-Slovene State. Serbian legations, consulates, and missions became the legations, consulates and missions of the Serb-Croat-Slovene State. The Serbian ruling family remained in power, *accepting* sovereignty over the newly annexed provinces. The Serbian Constitution of 1903 continued in force until the adoption of a new constitution in 1921. * * *."

20. Hugo Grotius, the father of modern international law, addressing himself to a situation somewhat similar to that under discussion, said:

"Whenever two nations become united, their rights, as distinct states, will not be lost, but will be communicated to each other. * * * The same reasoning holds good respecting states, which are joined, not by a federal *Union*, but by having one sovereign for their head." Grotius, The Rights of War and Peace, 1625, Translation from the Latin by Rev. A. L. Campbell, 1814, Vol. I, p. 339.

In Crandall, Treaties, it is stated at page 431:

"If a state, after incorporation into another, while losing its international personality still retains a territorial identity with full power of action over the subject-matter of a treaty previously concluded, the other contracting party may reasonably insist upon recognition by the new or acquiring state of the continuing obligation of the treaty, so far as consistent with the new order of things. The continuance of the obligation under such circumstances would however result from the subsequent recognition or mutual agreement of the parties, rather than through state succession."

21. See e. g. Art. II, § 2, Cl. 2, Constitution of the United States.

22. United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255.

equipped vehicle for decision than the Chiefs of State of the countries concerned. If their agreed decisions, when based upon supporting facts, are not conclusive, they should at least weigh very heavily.[23] As the Supreme Court said in Terlinden v. Ames, 1902, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534, an extradition case closely resembling the instant case: "And without considering whether extinguished treaties can be renewed by tacit consent under our Constitution, we think that on the question whether this treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance." 184 U.S. at page 285, 22 S.Ct. at page 490.

In our case, open recognition of treaties between the two countries has continued for many years [24] without United States congressional interference, a fact negative in nature, yet highly consistent with the conclusion that the treaties exist in full effectiveness.[25]

23. See Terlinden v. Ames, 1902, 184 U.S. 270, 288, 22 S.Ct. 484, 46 L.Ed. 534; Trustees of University v. Miller, 1831, 14 N.C. 188, 193 [Reprint 207, 212]; Charlton v. Kelly, 1913, 229 U.S. 447, 474, 476, 33 S.Ct. 945, 57 L.Ed. 1274; Kennett v. Chambers, 1852, 14 How. 38, 55 U.S. 38, 14 L.Ed. 316; Foster v. Neilson, 1829, 2 Pet. 253, 308, 27 U.S. 253, 308, 7 L.Ed. 415.

See also: Charles C. Hyde, International Law, Chiefly as Interpreted and Applied by the United States, Vol. II, page 1461: "§ 527. Political Questions. In lending their aid to secure performance of treaties, the courts of the United States feel bound to respect the attitude of the political department of the Government with regard to political questions. [Citing Doe ex dem. Clark v. Braden, 1853, 16 How. 635, 657, 57 U.S. 635, 657, 14 L.Ed. 1090.] Thus whether a treaty is still in force is regarded as one to be determined by that department; and it is declared that 'whether power remains in a foreign State to carry out its treaty stipulations is in its nature political and not judicial'. [Terlinden v. Ames, 184 U.S. 270, 288, 22 S.Ct. 484, 46 L.Ed. 534.] It has been intimated, however, in behalf of the Supreme Court of the United States, that in a case involving private rights, that Tribunal might be obliged, if those rights were dependent upon the construction of a treaty, and the case turned upon a question public in its nature, which had not been determined by the political department in the form of a law specifically settling it, or authorizing the executive to do so, to render judgment. [Citing In re Cooper, 1892, 143 U.S. 472, 503, 12 S.Ct. 453, 36 L.Ed. 232; Cordova v. Grant, 1919, 248 U.S. 413, 39 S.Ct. 138, 63 L.Ed. 334.]" See also § 533.

It was said in Oetjen v. Central Leather Company, 1918, 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726: "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."

See Guaranty Trust Corp. v. United States, 1938, 304 U.S. 126, 137, 58 S.Ct. 785, 82 L.Ed. 1224; and Hackworth, Digest of International Law, Vol. I, pages 161–166.

24. A certificate of the Yugoslav Ambassador and a certificate of the Secretary of State of the United States were filed as exhibits in this case stating that the Treaty of Extradition with Serbia continued in force and was applicable to the territory constituting the Kingdom of the Serbs, Croats and Slovenes and, by changes in name, of the Kingdom of Yugoslavia and the Federal Peoples' Republic of Yugoslavia; See also A list of Treaties and Other International Acts of the United States of America in Force December 31, 1932, published by the Department of State in 1933, and revised in 1941, at p. 94; and the loose-leaf treaty publication, United States Treaty Developments, Appendix III(C), started in 1947.

Disconto Gesellschaft v. Umbreit, 1908, 208 U.S. 570, 581, 28 S.Ct. 337, 52 L.Ed. 625.

25. Ribas y Hijo v. United States, 1904, 194 U.S. 315, 324, 24 S.Ct. 727, 48 L.Ed. 994; Fong Yue Ting v. United States, 1893, 149 U.S. 698, 720, 13 S.Ct. 1016, 37 L.Ed. 905; Chae Chan Ping v. U. S. (Chinese Exclusion Case), 1889, 130 U.S. 581, 600, 9 S.Ct. 623, 32 L.Ed. 1068; Whitney v. Robertson, 1888, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386; Edye v. Robertson (Head Money Cases), 1884, 112 U.S. 580, 599, 5 S.Ct. 247, 28 L.Ed. 798.

The judgment is reversed and the proceedings are remanded to the district court with instructions to find that the extradition treaty executed by and between the United States and Serbia in 1902 is a present, valid and effective treaty between the United States and the Federal Peoples' Republic of Yugoslavia, and has been a valid and effective treaty continuously since its execution between the United States and Serbia and through the changes in official title of the latter state to its present title of Federal Peoples' Republic of Yugoslavia. Upon remand the district court will consider and adjudicate the issues raised by the pleadings.

Reversed and remanded.