Salome Bara
**ARNBJORNSDOTTIR–MENDLER,
Appellant/Plaintiff,**

v.

**UNITED STATES of America,
Appellee/Defendant.**

No. 83–5571.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1983.

Decided Dec. 8, 1983.

Eugene Iredale, San Diego, Cal., for appellant/plaintiff.

Pamela J. Naughton, San Diego, Cal., for appellee/defendant.

Before FLETCHER and NELSON, Circuit Judges, and CORDOVA,* District Judge.

NELSON, Circuit Judge:

Salome Bara Arnbjornsdottir-Mendler ["Mendler"], an Icelandic national residing in California, appeals from the denial of a petition for a writ of habeas corpus. That petition followed a magistrate's finding that she was properly extraditable to Iceland. Appellant argues: 1) that there is no extradition treaty between the United States and Iceland, and 2) that even if there were a treaty, the district court erred in failing to require a government showing that Mendler would not be maltreated once returned to Iceland. We affirm.

FACTS

Iceland seeks the extradition of appellant Mendler in connection with a charge by Iceland's Criminal Court of Drug Offenses of three counts of importation and sale of narcotics. A warrant was issued for her arrest on June 18, 1979.

A verified complaint was presented to Magistrate J. Edward Harris requesting a warrant for the arrest of Mendler pursuant to 18 U.S.C. § 3184. On October 31, 1981, a warrant was issued, and on November 3, 1981, Mendler was arraigned. At the hearing on extraditability on January 12, 1982, Magistrate Harris determined that: 1) the court had jurisdiction to hear the case; 2) the appellant was present before the court and was in fact Salome Bara Arnbjornsdottir-Mendler, the person sought by the Iceland authorities; and 3) there was suffi-

---

* The Honorable Valdemar A. Cordova, United States District Judge for the District of Arizona, sitting by designation.

cient probable cause to believe appellant committed the crimes charged.

Further hearings were held in March, 1982 on the issues: 1) whether a valid treaty of extradition exists between the United States and Iceland; and 2) whether appellant had been sufficiently charged with a crime in Iceland. Magistrate Harris subsequently certified Mendler's extraditability and permitted her to remain on bond.

On May 4, 1982, Mendler petitioned the District Court for the Southern District of California for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 for review of the magistrate's finding of extraditability. On January 28, 1983, the district court filed its Memorandum Decision and Order denying appellant's petition. On February 3, 1983, the district court filed an Amended Memorandum Decision and Order denying appellant's petition and ordering the original exhibits sent to the Secretary of State for use in issuing a warrant of extradition, pursuant to 18 U.S.C. § 3186. This appeal followed.

DISCUSSION

I. *Existence of a Treaty*

■ The first issue in this case is whether Iceland and the United States have a valid extradition treaty. Since this is a question of law, this court may review the issue *de novo*. *Ivancevic v. Artukovic,* 211 F.2d 565, 567 (9th Cir.1954).

To follow Mendler's argument, one must take a look at Icelandic history. In 1902, when Denmark and the United States concluded an extradition treaty, Iceland was an island possession of Denmark. The 1905 Supplementary Convention made the 1902 Treaty applicable to Iceland by providing that the United States could request the surrender of a fugitive through the government of any Danish island possession or colony, including Iceland. In 1918, Iceland declared itself a separate sovereign through the so-called 1918 Act of Union. Paragraph IV of Article 7 of this Act provides in relevant part:

> Treaties which already have been made between Denmark and other countries

and are published, and concern Iceland, also are in force there (in Iceland).

Iceland continued to recognize the King of Denmark until 1944, when it established a republic through an act which made only minor changes in the political structure enunciated in the 1918 Act of Union.

In 1961, Iceland and the United States each signed the multilateral Single Convention on Narcotic Drugs, which permitted the inclusion of drug offenses among those crimes extraditable under any treaties existing between signatories.

In 1968, Denmark notified the United States of its desire to terminate the 1902/05 Treaty. The United States accepted the termination, and the Treaty ceased to be in force as between Denmark and the United States as of June 17, 1968.

Mendler argues that the 1902/05 Treaty, if it ever applied to Iceland, was automatically abrogated when Iceland became a republic. Since a court may certify extraditability only pursuant to a treaty obligation, 18 U.S.C. § 3181, Mendler concludes that she cannot legally be extradited.

Judicial examination of the existence of extradition treaties has been limited by a Supreme Court decision which stressed the importance of deferring in such cases to the intentions of the State Departments of the two nations. *Terlinden v. Ames,* 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902). In *Terlinden,* it was argued that the 1853 extradition treaty between the Kingdom of Prussia and the United States was dissolved when the German Empire emerged in 1871. The Supreme Court found the treaty valid based on the intentions and actions of the parties, stating that "the decisions of the Executive Department in matters of extradition, within it own sphere, and in accordance with the Constitution, are not open to judicial revision." *Id.,* at 290, 22 S.Ct. at 492.

In *Ivancevic, supra,* this court followed *Terlinden*'s mandate in examining whether the extradition treaty executed between the United States and the Kingdom of Serbia in 1902 was valid and effective as between the United States and the Federal Peoples' Re-

public of Yugoslavia. In holding that a valid treaty did exist, the court stated:

There is no exact formula by which it can be determined that a change of a nation's fortunes amounts to a continuance of the old or the beginning of a new nation, and there can be no better equipped vehicle for decision than the Chiefs of State of the countries concerned. *Id.,* at 573–74.

The actions/intentions evidence gathered from both States involved here supports the conclusion that the U.S.—Iceland treaty is in force. T. Michael Peay, Deputy Assistant Legal Advisor for the United States Department of State, has submitted an affidavit maintaining that "the United States and Iceland have been governed continuously pursuant to the terms of [the 1902/05] treaties." The 1902/05 Treaties have both been incorporated into U.S. domestic law [32 Statutes-at-Large 1906; 34 Statutes-at-Large 2887], and are included in *Treaties in Force,* a Department of State publication listing treaties extant in 1981.

The Embassy of Iceland has also endorsed the existence of the Treaty. The Ambassador and Legal Advisor of Iceland's Ministry of Foreign Affairs stated in a 1981 diplomatic note that both treaties "are regarded by the government of Iceland as having been and continuing to be in full force and effect." He continued, "This is in conformity with the fact that by the Union Act of 1918 Iceland undertook to honor treaties made by Denmark with Foreign Counties prior to that time." The Treaty has been listed in the *Icelandic Law Gazette,* Iceland's *Treaties in Force,* in every issue.

Additional factors weigh in favor of the Treaty's existence. Other courts have recognized treaties entered into by a nation when that nation was under the control of another sovereign, even when, as here, the original sovereign was no longer bound by the treaty. In *Jhirad v. Ferrandina,* 355 F.Supp. 1155 (S.D.N.Y.1973), *rev'd on other grounds,* 486 F.2d 442 (2d Cir.1973), India successfully employed a 1933 extradition treaty entered into between the United States and Great Britain, even though in the interim India had gained independence

and Great Britain had signed a new treaty with the United States. The court found persuasive the close geographical identity of British India and India, India's agreement to take an assignment of all treaties signed on its behalf by Great Britain, and the fact that India's change to a republic was more evolutionary than radical. 355 F.Supp. at 1159–60. All of these factors are present in the case of Iceland.

In *Ivancevic, supra,* this court found enough political and geographical unity to apply the Serbian extradition treaty to Yugoslavia despite the intervening gain and loss of territory and progression from democracy to monarchy to socialism. Since Iceland's independence was accompanied by neither political nor geographical upheavals, we do not hesitate to find adequate continuity in this case.

Mendler makes three unconvincing arguments why this court should not find a valid treaty. First, she cites several treatises to support the proposition that new states start their juridical lives free from treaty obligations assumed by their predecessors. She offers no evidence, however, that the Republic of Iceland ever ceased to recognize the treaty obligations which it undertook in 1918. Moreover, the court in *Jhirad, supra,* noted that "the weight of authority supports the view that new nations inherit the treaty obligations of the former colonies." *Id.,* at 1159.

Second, Mendler presents a linguistic analysis of the 1902 Treaty to demonstrate that only Denmark was bound by its terms. However, not only did Denmark implicitly control Iceland's foreign affairs at that time, but also the 1905 Supplementary Convention made the 1902 Treaty expressly applicable to Iceland.

Finally, Mendler argues that even if Iceland was bound by the Treaty after 1944, its obligation ended in 1968, when Denmark terminated its own participation. This contention is also without merit. Since Iceland was no longer under Denmark's control in 1968, Denmark's abrogation had no effect on Iceland and its treaty obligations.

In sum, judicial deference to the Executive Branch on extradition matters, coupled with an independent review of Iceland's historical continuity, affirm the existence of a valid treaty.

## II. *Reviewability of Conditions in Requesting Country*

An extraditing court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country. *Gallina v. Fraser,* 278 F.2d 77, 78 (2d Cir.1960); *Garcia-Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). The rationale is that such matters are to be determined solely by the executive branch.

Mendler has submitted an affidavit expressing the belief that she will be subjected to solitary confinement during questioning in Iceland, a practice she deems "brutal and unfair." She contends that her case falls within a caveat enunciated in *Gallina, supra,* where the court stated in dictum:

> We can imagine situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of [the general principle upholding extradition]. *Id.* at 79.

This exception has yet to be employed in an extradition case, even in situations much more compelling than that described in Mendler's unsubstantiated affidavit. In *Gallina,* a fugitive was denied habeas relief despite the fact that he would be imprisoned in Italy without an opportunity to defend himself. In *In re Ryan,* 360 F.Supp. 270 (E.D.N.Y.1973), the defendant was a former SS guard charged with murder in Ravensbruck Concentration Camp, Germany. Despite her contention that she would be prejudiced by the German courts, the court, quoting *Gallina,* maintained that the conditions under which a fugitive is surrendered are to be reviewed solely by the non-judicial branches of government. *Id.,* at 274. In *Sindona v. Grant,* 619 F.2d 167, 174 (2d Cir.1980), the court similarly refused to entertain defendant's claim that his return to Italy would subject him to risk of murder or injury at the hands of political enemies.

In light of Iceland's outstanding human rights' record and appellant's uncorroborated prediction of maltreatment, the district court had no obligation to hold an evidentiary hearing to consider the claim.

We therefore AFFIRM the district court's finding that a valid U.S.—Iceland extradition treaty exists and hold that the district court judge did not err by failing to consider the claim of potential maltreatment in Iceland.